UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


JERRY WILLIAM CORRELL,

      Petitioner,

v.                                                                    Case No. 8:90-cv-315-T-23MAP
**DEATH PENALTY**

SECRETARY, Department of Corrections,

      Respondent.

_____/


# O R D E R

      In a single killing spree Jerry Correll murdered four victims, including his ex-wife

and their five-year old daughter.  Correll petitions for the writ of habeas corpus under

28 U.S.C. § 2254 (Doc. 71) and challenges the validity of both his convictions for four

murders and his four death sentences.  Correll asserts numerous errors allegedly

committed by both the trial court and his attorneys.  Based on the overwhelming

evidence of guilt, the substantial evidence of aggravation, and the meager evidence of

mitigation, Correll's challenges to both the convictions and the sentences lack merit.[1]

---

[1] As discussed later in section IV, Correll's petition is reviewed in the district court *de novo* because the petition pre-dates enactment of the Anti-Terrorism and Effective Death Penalty Act, which requires a more deferential review.  Nevertheless, Correll is entitled to no relief even with a lenient, *de novo* review.

This action proceeds on Correll's third amended petition[2] (Doc. 119)—which was filed in late 2010—the response (Doc. 120), and the reply (Doc. 123)—both of which were filed in 2011.  Several grounds are procedurally barred from federal review and the remaining grounds lack merit.

## I.  PROCEDURAL BACKGROUND

In 1986 Correll was convicted of four first-degree murders.  The victims were Susan (his ex-wife), Tuesday (their five-year old daughter), Marybeth Jones (Susan's sister), and Mary Lou Hines (Susan's mother).[3]  Correll was sentenced to death for each murder.[4]  *Correll v. State*, 523 So. 2d 562 (Fla. 1988), *cert. denied*, 488 U.S. 871 (1988) ("*Correll I*"), affirmed each conviction and each death sentence.  In 1990 Correll moved to vacate his sentences under Rule 3.850, Florida Rules of Criminal Procedure, and alleged that he was denied the effective assistance of trial counsel.  The post-conviction judge, who was also the trial judge, denied Correll's motion for post-conviction relief.  In a state petition for extraordinary relief in the Florida Supreme Court under Rules 9.030(a)(3) and 9.100(a), Florida Rules of Appellate Procedure, Correll alleged that he was denied the effective assistance of appellate counsel.  In a consolidated order on the petition for extraordinary relief and appellate review of the denial of the Rule 3.850

---

[2] Each ground identified in this order appears in the third amended petition.

[3] To avoid confusion, this order refers to the four victims, respectively, as Susan, Tuesday, Ms. Jones, and Mrs. Hines.

[4] The jury's recommendation for death was 9-3 for Susan and 10-2 for Tuesday, Ms. Jones, and Mrs. Hines.  (Respondent's Exhibit XXIX at 4075-81)

motion to vacate, the Florida Supreme Court denied relief. *Correll v. State*, 558 So. 2d 422 (Fla. 1990) ("*Correll II*").

In 1990 Correll filed his initial Section 2254 petition for the writ of habeas corpus. The action was stayed in 1995 (Doc. 51) to permit Correll to exhaust a claim based on newly discovered evidence. In 1998 the action was re-opened (Doc. 58) after the state court proceedings concluded in *Correll v. State*, 698 So. 2d 522 (Fla. 1997) ("*Correll III*"). In 1999 the federal action was transferred (Doc. 72) to the Orlando Division because the murders occurred in Orange County and Correll was indicted in Orange County. However, the Orlando Division transferred (Doc. 88) the action back to the Tampa Division because after a change of venue the trial occurred in Sarasota County. In 2002 the action was again stayed (Doc. 99) to await the Florida Supreme Court's determination of the effect on Florida law of *Ring v. Arizona*, 536 U.S. 584 (2002). In 2005 the action was re-opened. (Doc. 111)

The state court record was lost during the pendency of this federal action, in part (perhaps) because both the Tampa and Orlando Divisions moved into a new courthouse. A July 5, 1994, docket entry shows that the record was initially received in the Tampa Division. An April 2, 1999, docket entry shows that the record was "placed in the death penalty room" in Orlando following the transfer to that division. The new courthouse in Orlando opened after the date of the docket entry. No docket entry shows that the record was either transferred to, or received by, the Tampa Division after the action was transferred back to the Tampa Division. Following a long and

exhaustive search, in late 2010 the state court record was located at the Federal Records Center in Georgia.  Discovery of the record was complicated because (1) the submission to the records center was in error, (2) the submission was not recorded on the docket sheet, and (3) the submission was improperly recorded on the list of archived records. The parties filed new briefs after the state court record was returned from the federal archives.[5]

## II. FACTS

Correll's murders were grisly, the crime scene was gory, and Correll's guilt is indisputable because of the overwhelming, incriminating evidence. *Correll I*, 423 So. 2d at 564, reports the facts of the murders as follows:

> On the morning of July 1, 1985, the bodies of the four victims were discovered in [Mrs. Hines]'s home in Orlando.  All had been repeatedly stabbed and died from massive hemorrhages; the three older victims had defensive type wounds on their hands.  A sheriff's department investigator was called to the crime scene and approximately an hour and a half after his arrival encountered Jerry Correll there.  Correll was asked for a statement and subsequently went to the sheriff's department where he gave first an oral and then a tape recorded statement.  In his statement, Correll indicated that on the night of the murders he had been drinking and smoking marijuana with a woman, who later drove with him to Kissimmee.  While at the sheriff's department, Correll consented to having his fingerprints taken and having pictures of the scratches, cuts and bruises on his hands and forearms taken.  The next day, Correll was again interviewed and subsequently arrested.  After being advised of and waiving his *Miranda* rights, Correll gave another statement after his arrest.  Several bloody fingerprints and palm prints found at the murder scene were later matched to Correll's.  Evidence that he had

---

[5] Both counsel agreed that an updated petition and new memoranda were required in part because neither the second amended petition nor the memoranda nor several of the supplements were imaged.

previously threatened to kill his ex-wife was also admitted.  In
addition, he could not be ruled out as the person whose bloodstains
were found at the scene and whose sperm was found in Susan
Correll's vagina.[6]

The following more detailed facts about the murder of Susan Correll are from the

prosecution's answer brief on direct appeal (Respondent's Exhibit XXXV at 127-30),

are not in conflict with the facts from Correll's opening brief on direct appeal

(Respondent's Exhibit XXXV at 1-30), and are supported by the record.[7]

The evidence in this case indicated that Susan Correll had at least
fourteen (14) separate stab wounds, and that she bled to death from a
massive hemorrhage produced by the wounds to her chest and
abdomen (R 777, 1871).  According to the [medical examiner], the
wounds were inflicted in two "clusters" or "phases" involving the
infliction of superficial yet painful and traumatizing wounds to the
neck, followed by the "killing" phase involving the infliction of fatal
wounds to the chest, back and abdomen (R 1869-1870; 1891).  [The
medical examiner] testified that the wounds, which penetrated the
lungs, would have resulted in severe pain, and that they would not
have incapacitated the victim or rendered her unconscious (R 1876);
indeed the doctor testified that the victim could have lived for as long
as ten to fifteen minutes after infliction of these wounds (R 1877).

---

[6]  The exactness of current DNA testing was not available when Correll was tried in 1986.
Instead, the prosecution's expert used the electrophoresis process to test the blood evidence.  *Correll I*,
423 So. 2d at 566, summarizes the expert's testimony as follows:

The electrophoresis process is a method used to determine the presence
of certain enzymes in the blood so that blood may be broken down into
more categories than the customary antigen groups of A, B and O.  As a
result of testing blood samples through the use of this process, [the
prosecution's expert witness] was able to express the opinion that certain
blood found at the murder scene could have been Correll's but could not
have been from any of the victims or from three others who might have
been considered to be suspects.

In ground IV(5) Correll alleges that trial counsel rendered ineffective assistance by not
challenging the validity of the electrophoreses process.

[7]  The citations to pages in the record are original to the brief and correctly cite the trial
transcript in Respondent's Exhibits I - XXVII.

The autopsy slides indicate that Susan Correll suffered an extreme extensive wound to the abdomen, some seven inches deep, which resulted in the exposure of a great deal of her intestine (R 769-770); the [medical examiner] testified that there were indications that either the victim or the knife had moved while this wound was being inflicted (R 770).  Likewise, the testimony and the slides indicate the existence of a significant number of defensive wounds on both of the victim's hands, indicating that she sought to defend herself against the constant onslaught and that, as a result, she cut herself on the knife (R severed.  The [medical examiner] also noted the presence of a number of bruises and abrasions on the victim's forehead, shoulder blade, thighs and legs (R 781-2).

The bloodstain pattern expert testified that, in her opinion, Susan Correll had been stabbed in the hallway outside her bedroom (R 1535-7).  She had then been dragged into the bedroom and placed on her bed; the [medical examiner] testified that there was no way that Susan Correll would have been able to travel this distance on her own (R 782,1885).  The teeshirt she had been wearing at the time she had been stabbed was removed, and when she was found, Susan Correll was nude (R 778).  Additionally, her body was partially covered by a sheet and the area from the mid-chest to the feet had been wiped clean of blood, a condition which could not have existed "naturally given the existence of substantial wounds (R 752-3).  A pillow was found on top of the deep abdominal wound, and two types of bloodstains were found on the pillow:  one type was consistent with that of Susan Correll, while the other was consistent with that of appellant only (R 755, 1375).  As best as can be determined, the testimony of the bloodstain pattern expert could not rule out the possibility that these bloodstains were transferred onto the pillow at a point in time when one body was atop the other (R 1524-6).  While no evidence of genital trauma was found, intact spermatozoa were found in Susan Correll's vagina (R 756, 1431).  [The forensic serology expert] testified that, based on appellant's blood type and "secretor status," appellant could not be ruled out as being the "source" of the semen, which could have existed in the victim's body from anywhere between eight hours and three days prior to discovery (R 1433-4).[8] The [medical examiner] testified that the lack of genital trauma could be consistent with commission of a sexual battery after the victim was dead (R 756-7, 839-40, 851, 1888).

---

[8]  Contrary to this eight-hour to three-day period, the report (Exhibit 5, Third Amended Petition, Doc. 119) by Dr. Pollack, the defense's mental health expert, states that Correll claimed "he last saw [the victims] reportedly one week before the events."

Near the completion of the medical examiner's testimony about the wounds to Susan's body and his use of slides and photographs depicting the wounds,[9] Correll asked to be excused from the trial (Respondent's Exhibit VII at 776):

> [Defense Counsel]:  Your Honor, I don't know whether this might be an appropriate time to take a recess.  We've been going somewhat more than an hour.  But I would also ask — Mr. Correll has not seen these things before and it has been very difficult for him — would it be appropriate —
>
> [Prosecutor]:  Your Honor, can we have something more than a speaking objection at this point?
>
> The Court:  What is your objection?
>
> [Defense Counsel]:  It's a request not an objection.  It's been very difficult for him.  I wonder if he might be excused until the showing of the slides is over.  I have talked to him about it and he would request that — I don't think there would be an objection in terms of —
>
> [Prosecutor]:  Your Honor, the State objects to that.  This is Mr. Correll's trial and he ought to be here.
>
> The Court:  Well, at this point we are going to be having the balance of the direct examination concerning those slides, and I will be taking a recess at that point, when we complete that, and I will take up these other matters.

After the medical examiner concluded his testimony about Susan, the trial court revisited Correll's request to be excused (Respondent's Exhibit VII at 783, 785-86):

> The Court:  All right.  Before the rest of us recess we will take up the Defendant's request to be absent at his own trial.  I also am of the mind that Mr. Correll should be here at all critical stages of the proceedings.  . . .  He should be here for all critical stages of the proceedings against him.  He should view the evidence that the State is presenting in the trial against him, particularly in a case of this nature.  The question is whether or not I legally can require him to

---

[9]  In ground XII Correll challenges the introduction of the gruesome photographs.

remain in the courtroom during the course of his trial or whether he
does, in fact, have the right to be absent from his own trial, absent
some type of behavior necessitating it.

. . . .

[Prosecutor]: Your Honor, it's the State's position that Mr. Correll
needs to be present. There is no authority that I know of, casewise,
for the defendant to pick and choose which portions of the trial that
he wants to attend. . . . It's the State's position that this is Mr.
Correll's trial. He has a right to confront the evidence and the
witnesses. I don't see anything disruptive about his behavior, at this
particular point, to cause the Court to force him to leave, and I didn't
see any reason why we should let him leave and come when he wants
to.

The Court: All right. I'm going to deny the request to allow Mr.
Correll to pick and choose what portions of this trial he wishes to
attend. If he does not wish to view portions of the evidence, I suggest
he turn his head or close his eyes. For so long as it does not
necessitate his removal from the courtroom, I intend to have him
present during the course of his own trial.

The following more detailed facts about the murder of Tuesday Correll are

from the prosecution's answer brief on direct appeal (Respondent's Exhibit XXXV at

144-45), are not in conflict with the facts from Correll's opening brief (Respondent's

Exhibit XXXV), and are supported by the record.

The evidence in this case indicates that Tuesday Correll suffered
at least ten (10) stab wounds, and that she bled to death from a
massive hemorrhage as a result of the multiple stab wounds to her
chest (R 798). As with the other victims, the [medical examiner]
testified that the wounds were inflicted in two "phases," the first
involving the infliction of superficial, yet painful and traumatizing
wounds to the head, such "phase" followed by the infliction of fatal
wounds to the chest (R 1879- 1881). In this instance, one such
terrorizing wound was a stab wound to the ear, and the [medical
examiner] also noted marks on Tuesday's neck which would have
been consistent with the knife having been pressed very hard against
it; the doctor stated that such mark was consistent with the child
having been held as a hostage, and noted that slight movement had

- 8 -

produced a superficial cut (R 790-1, 1879-1880).  Likewise, the
[medical examiner] noted the cluster of stab wounds to her chest,
including wounds which had penetrated her lungs and heart
(R 791-6).  The doctor pointed out the "butterfly" or "heart"
configuration of one such wound, seemed to indicate that either the
knife or the child had moved during the stabbing (R 792-3).  [The
medical examiner] stated that the wounds to the lung would have
been quite painful, and that the child would have lived between two
to three minutes after infliction of the chest wound (R 1880-1).  The
doctor also noted the presence of stabs on the child's back and a
number of abrasions or bruises on her legs (R 796-7).  When she was
found, Tuesday was clad in a nightgown and panties, and the
bloodstain pattern expert testified that Tuesday was stabbed while in
the hallway, and that she was later moved to the bed in her room
(R 788, 1534-5).

The following more detailed facts about the murder of Ms. Jones are from the

prosecution's answer brief on direct appeal (Respondent's Exhibit XXXV at 137-38),

are not in conflict with the facts from Correll's opening brief (Respondent's Exhibit

XXXV), and are supported by the record.

The evidence in this case indicates that Marybeth Jones suffered at
least fourteen (14) stab wounds, and that she bled to death from a
massive hemorrhage, as a result of the stab wounds to her chest
(R 824).  The [medical examiner] likewise testified, as in the case of
Susan Correll, that these wounds had been inflicted in two phases, the
first involving the infliction of superficial, yet painful and
traumatizing wounds to the neck and face, the second involving the
"killing" phase, wherein fatal wounds were inflicted to the chest (R
1881-3).  Again, as with Susan Correll, the wounds were not
immediately fatal, and the [medical examiner] testified that the victim
could have lived up to ten minutes after the chest wounds were
inflicted (R 1882).  [The medical examiner] testified that one of the
wounds was consistent with a knife having been drawn across the
victim's neck, and further noted that one of the major veins on the
neck had been penetrated (R 820).  The [medical examiner] stated
that some of the wounds could have been inflicted from behind or
while the victim was lying on the floor (R 820-1).  The fatal stab
wounds had penetrated the lung, liver and kidney (R 821).  The
[medical examiner] noted the presence of slight defensive wounds on
the hands (R 822-3).

In all likelihood, according to the bloodstain pattern expert, Miss Jones was first attacked in the kitchen, her body then dragged through the utility room and into her bedroom (R 747-8, 886, 1539-40). When she was found, Marybeth Jones was wearing only a blouse and a pair of panties (R 814): an ice cube tray was found out on the kitchen counter which was spattered with blood matching that of either Marybeth Jones or appellant (R 271). Blood consistent with that of appellant was found on several items in her room, including her wallet and purse (R 276). At the time she was found, the television and fan in her room were both still turned on, and the door to the outside was locked and bolted (R 595). Additionally, at the time that the wallet was found, it contained no paper currency, although a witness who had been in the company of Miss Jones earlier that day, testified that he had seen bills inside of her wallet (R 583); when appellant was arrested, a bloodstained twenty dollar bill was found in his possession (R 1429-30). Likewise, when Miss Jones was found, her automobile, a black Mustang, was missing. Her boyfriend testified that he had last seen her drive off toward home at around midnight on the night of the murders (R 573); the car was later found, abandoned in a parking lot, with a bloodstain on the driver's seat, and the keys subsequently turned up on the trunk of Richard Henestofel's disabled vehicle[10] (R 997, 1026-7, 1205-8, 1426).

The following more detailed facts about the murder of Mrs. Hines are from the prosecution's answer brief on direct appeal (Respondent's Exhibit XXXV at 151-52), are not in conflict with the facts from Correll's opening brief (Respondent's Exhibit XXXV), and are supported by the record.

---

[10] All four of the vehicle's tires had been sliced. Testimony was presented to the jury that Correll had sliced the tires on Susan's car two years earlier. This evidence of a "collateral crime" is the subject of ground XIII.

About three or four weeks before the murders Mr. Henestofel met Correll and Susan. Soon thereafter Mr. Henestofel joined their "social group," as defense counsel characterized the arrangement. All three frequented the same local bar. On the night of the murders, Correll left the bar before Mr. Henestofel, who discovered that his car had four flat tires when he attempted to leave. When he returned to retrieve his car the following morning, Mr. Henestofel saw two cuts on each tire. (Respondent's Exhibit IX at 1022, 1025, 1026, and 1045) Additionally, Mr. Henestofel testified that five days before the murders Correll stated that Susan cannot hide because he still had a key to the house. (Respondent's Exhibit IX at 1023-24)

The evidence in this case indicated that Mary Lou Hines had at least fourteen (14) separate stab wounds, and that she bled to death from a massive hemorrhage of the chest cavity; the [medical examiner] also noted that because of the penetration of her trachea, Mrs. Hines had been forced to breathe in some of her own blood (R 810-811).  In contrast to the other victims, the two "phases" of attack were not present in this case.  Instead, the evidence indicated that the wounds had been inflicted, for the most part, in one massive cluster (R 1870, 1883).  The [medical examiner] specifically identified those stab wounds which had penetrated the lungs, some of which were as deep as seven inches (R 805-6);  he likewise noted those which had penetrated the aorta and the windpipe (R 807, 808).  [The medical examiner] testified as to the presence of extensive defensive wounds on both of the victim's hands, and the slides introduced indicate that Mary Lou Hines's left hand was severely gashed and that her thumb was almost severed (R 1883-4; 808-9, slide numbers 451, 452, 453); several of the fingers of her left hand were cut all the way to the bone (R 809).  Her body had a significant number of bruises and abrasions in many areas, including around the jaw, forehead, bridge of the nose, legs and shoulder (R 803,812, 1885).  [The medical examiner] testified that the chest and hand wounds would have produced a significant amount of pain, and stated that the victim had, in all likelihood, lived for up to five minutes after infliction of the fatal wounds (R 1884-5).

It is clear from the testimony of both [the medical examiner] and the bloodstain pattern expert that a fierce bloody struggle had ensued between appellant and Mrs. Hines (R 1883-4, 747, 1540).  She showed the most resistance of any victim.  The struggle was so severe that Mrs. Hines's dental plate was knocked out (R 813).  The bloodstain evidence indicated that Mrs. Hines was first attacked while outside of Tuesday's room, and that she was attacked fiercely while within that room; her blood was found spattered on the walls (R 1537-8).  The expert likewise noted the presence of blood on the inside of the door and on the carpet, and stated that it was likely that the victim had been stabbed while kneeling on the floor or while backing up toward the bed (R 1538).  The witness also stated that Mary Lou Hines had been stabbed while she was lying on the bed, and that the injuries to her forehead were consistent with her having come into contact, forcefully, with the wall (R 813, 1883).  When she was found, the victim was wearing a nightgown (R 800).

Lawrence Smith testified (1) that, while confined in solitary confinement in the

Orange County jail, he and Correll were in adjoining cells, (2) that they would converse

while walking in the recreation area, and (3) that they would talk while in their

respective cells.[11]  Smith testified that, although Correll never admitted to committing

the murders, Correll admitted that "he was there that night."  (Respondent's Exhibit X

at 1283)  Smith also represented that Correll claimed to have contracted with a friend in

a motorcycle gang to kill Susan but that Correll "had got back in good with his ex-wife"

before the contract was fulfilled.  (Respondent's Exhibit X at 1280)  Smith testified that

Correll claimed that he would use an alibi defense.  Initially Correll stated that he was

going to claim that he spent the evening with a woman named June but later he claimed

that some friends were going to "set up" an alibi for him.  "He said that they were going

to be his alibi witnesses.  That those people and other people that were his friends, who

he didn't name, were going to set up an alibi for that night."  (*Id.* at 1284)  Lastly Smith

testified that Correll commented about the murder of Tuesday (*Id.* at 1289):

> Q:  He never specifically talked about how the murders took place,
> did he?
>
> A:  No.
>
> Q:  He did, however, say he would have to be insane to kill his own
> daughter, is that right?
>
> A:  He said that the jury would believe he was insane, anybody that
> would kill his own daughter.

The trial court sentenced Correll to death for each murder and found that

"Correll had been previously convicted of another capital offense" as an aggravating

---

[11]  In ground IV(6) Correll alleges that trial counsel rendered ineffective assistance by not
moving to suppress the testimony of Lawrence Smith.

factor applicable to each murder.  *Correll I*, 423 So. 2d at 564.  The trial court found

both the presence of additional aggravating factors for the murder of each victim and

the absence of a mitigating factor (Respondent's Exhibit XXIX at 4095-97):

The Murder of Susan Correll was Committed
During the Course of Sexual Battery

The presence of intact sperm in the vagina of Susan Correll which
was consistent with the blood type of the Defendant when considered
in conjunction with the testimony of [the crime scene re-construction
expert], demonstrates beyond a reasonable doubt that her killer had
sexual intercourse with her after infliction of the abdominal wound.

The Murder of Susan Correll was Committed in an
Especially Heinous, Wicked, Atrocious and Cruel Manner

The testimony of [the medical examiner] revealed that a great many
of the stab wounds to the neck area of Susan Correll were relatively
shallow and superficial.  These wounds would cause great pain but
were not immediately life threatening.  A slicing type wound on the
back of Susan Correll also would have caused great bleeding and pain
but was not itself life threatening.  These wounds, when considered
with the great number of stab wounds found on many different parts
of her body, demonstrate beyond a reasonable doubt that Jerry
Correll tortured Susan Correll in the course of murdering her.

The Murder of [Ms. Jones] was
Committed During the Course of a Robbery

The evidence shows that after Jerry Correll stabbed [Ms. Jones]
numerous times he took her car keys and left the scene in her
automobile.  He was able to secure this getaway vehicle by rendering
her unconscious with a knife.

The Murder of [Ms. Jones] was Committed
for the Purpose of Avoiding or Preventing a Lawful Arrest

[Ms. Jones] had the misfortune of returning to her home before the
killer had left.  She knew Jerry Correll.  She could identify Jerry
Correll.  Jerry Correll killed Mary Beth Jones in order to eliminate the
only person alive who could identify him as the killer.  There is no
other reasonable explanation.

- 13 -

The Murder of Tuesday Correll was
Especially Heinous, Atrocious, and Cruel

[The medical examiner] testified Tuesday Correll  lived
approximately five minutes before losing consciousness.  It is difficult
to imagine the degree of emotional anguish suffered by that dying
child.  She had apparently witnessed the brutal murder of her mother
and experienced the horror of her own father repeatedly driving a
sharp knife into her chest.  She had no defensive wounds.

The Murder of Tuesday Correll was
for the Purpose of Avoiding Arrest

The evidence from both sides revealed that the Defendant had a
normal loving relationship with his daughter prior to killing her.
There is no reasonable explanation for her murder other than to
permanently silence her as a witness to the death of her mother.

The Murder of Tuesday Correll was Committed
in a Cold, Calculated and Premeditated Manner Without
any Pretense of Legal or Moral Justification

This five year old child was clad only in her nighty and was clutching
her cloth doll when she was brutally and repeatedly attacked by her
own father.

The "hostage type" wounds on the neck of Tuesday Correll as well as
the "L" and "heart shaped" wounds caused by the movement of the
knife while in her chest evidence the heightened premeditation of the
Defendant at the time she was killed.

The Murder of [Mrs. Hines] was
Especially Heinous, Atrocious, and Cruel

The evidence revealed that the murderer of [Mrs. Hines] went far
beyond simply stabbing her to death.  She was bludgeoned about the
head and neck.  She was stabbed repeatedly and in many separate
"patterns."  She was chased while dying and had her fingers nearly
amputated while attempting to shield herself.  She was fifty-five years
old.

. . . .

<u>Mitigating Factors</u>

> The Court has carefully considered all statutory mitigating factors and finds that no mitigating circumstance exists in the evidence of this case.  The Court has also carefully examined and considered the record for any other factor or circumstance involving the case and the character of Jerry Correll.  No mitigating circumstances can be found.

Correll asserts fifteen grounds for relief.  The respondent correctly argues that some claims are procedurally barred from federal review.  This order addresses the procedural issues before reviewing the merits of the remaining grounds, which are addressed sequentially beginning with a pre-trial claim, followed by guilt and penalty phases claims, and concluding with Correll's ineffective assistance of counsel claims.

## III.  EXHAUSTION AND PROCEDURAL DEFAULT

A petitioner must present each claim to a state court before raising the claim in federal court.  "[E]xhaustion of state remedies requires that petitioners 'fairly presen[t]' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995), quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971).  *Accord Rose v. Lundy*, 455 U.S. 509, 518-19 (1982) ("A rigorously enforced total exhaustion rule will encourage state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error."), and *Upshaw v. Singletary*, 70 F.3d 576, 578 (11th Cir. 1995) ("[T]he applicant must have fairly apprised the highest court of his state with the appropriate jurisdiction of the federal rights which allegedly were violated.").  Also, a petitioner must present to the federal court the same

claim presented to the state court. *Picard v. Connor*, 404 U.S. at 275 ("[W]e have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."). "Mere similarity of claims is insufficient to exhaust." *Duncan v. Henry*, 513 U.S. at 366. *See also Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983)[12] ("The exhaustion requirement is not satisfied if a petitioner presents new legal theories or entirely new factual claims in support of the writ before the federal court.").

A petitioner must alert the state court that he is asserting a federal claim and not just a state law claim.

> A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal."

*Baldwin v. Reese*,  541 U.S. 27, 32 (2004).  As a consequence, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982). *See also Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1271, 1345 (11th Cir. 2004) ("The exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.") (citations omitted).

Unexhausted grounds are procedurally barred from federal review and not reviewable unless Correll overcomes the procedural default.  Correll must satisfy one of

---

[12]  Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

two tests to overcome procedural default, either (1) he shows "cause for the default and prejudice attributable thereto" or (2) he shows "that failure to consider [the defaulted] claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989).

To demonstrate "cause" for his procedural default, Correll must justify his failure to comply with Florida's procedural rules.  In general, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  *See Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).  Even if he shows cause for his procedural default, Correll must show prejudice arising from the alleged constitutional error.  A petitioner must show that he suffered actual prejudice, "not merely that the errors of the trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis original).  *Accord Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991).  In essence, to show actual prejudice, Correll must demonstrate that the alleged error so infected the trial that his resulting conviction violates due process.

As an alternative to showing "cause and prejudice," Correll must show that dismissal of his procedurally defaulted ground will result in a "fundamental miscarriage of justice," an especial difficulty because Correll must demonstrate "actual innocence"

of the crime of conviction.  *See Smith v. Murray*, 477 U.S. 527, 537 (1986) *(citing Murray v. Carrier*, 477 U.S. at 496).  *See also Engle v. Isaac*, 456 U.S. 107, 134-35 (1982), and *Ward v. Cain*, 53 F.3d 106, 108 (5th Cir. 1995) (denying a certificate of probable cause) (holding that a petitioner must show "as a factual matter that he did not commit the crime of conviction.").  Additionally, to meet the "fundamental miscarriage of justice" exception, Correll must show constitutional error coupled with "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Ground XII
Improper introduction of gruesome photographs deprived Mr.
Correll of a fundamentally fair trial.

The police processed a gory crime scene that contained the bodies of three adults and a little girl, each of whom was stabbed to death.  The testimony at trial revealed that the three adults each sustained at least fourteen stab wounds and that the little girl sustained ten stab wounds.  Correll complains that "the State was permitted to introduce numerous photographs of the victims, including over 100 pictures of the victims at the crime scene and at the morgue."  Correll further complains about "the admission of numerous additional photographs of the blood spatter at the crime scene, notwithstanding the fact that 105 blood-stained items including sections of the walls of the house were also entered into evidence."

- 18 -

In a pre-trial hearing Correll successfully objected to many of the photographs and the prosecution also withdrew several items.[13]  In his brief on direct appeal, Correll specifically objects to only nine photographs from the crime scene and eight photographs from the medical examiner's office.  *Correll I*, 523 So. 2d at 564 n.*, summarily rejected this ground without elaboration as one of ten grounds the court found "to be without merit . . . ."

Correll alleges that "[t]he prejudicial effect of this evidence outweighed its probative value; its introduction constituted constitutional error and denied Mr. Correll his fundamental right to a fair trial and sentencing."  The respondent correctly argues that this claim contests the trial court's evidentiary ruling, which is a matter of state law and not a federal constitutional issue.

A review of Correll's brief on direct appeal (Respondent's Exhibit XXXV, Point IV at 48) shows that, in presenting this ground to the state court, Correll argued only that the prejudicial effect outweighed the probative value and he failed to alert the state court that admitting the photographs and blood-stained items violated a constitutional right.  As a consequence, Correll's federal claim—that the "introduction constituted constitutional error and denied Mr. Correll his fundamental right to a fair trial and sentencing"—is both unexhausted and procedurally barred from federal review unless Correll can overcome the procedural default.  *See Anderson v. Harless*, 459 U.S.

---

[13]  The state's brief on direct appeal (Respondent's Exhibit XXXV at 13) details the pages in the record where counsel's objections were sustained and where the state withdrew items.

at 6 ("[T]he habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim."); *Picard v. Connor*, 404 U.S. at 275 ("We emphasize that the federal claim must be fairly presented to the state courts."). Correll presents no argument to overcome the procedural default. Consequently, ground XII is procedurally barred from federal review on the merits.

Even if not barred, this ground lacks merit. Federal habeas corpus relief is generally not available for an error of state law. *Pulley v. Harris*, 465 U.S. 37 (1984); *Wainwright v. Goode*, 464 U.S. 78 (1983). *See also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) ("Nor do our habeas powers allow us to reverse [a] conviction based on a belief that the trial judge incorrectly interpreted the" state's evidence rules.). A federal court possesses only limited authority to review a state evidentiary ruling by habeas corpus. *Burgett v. Texas*, 389 U.S. 109, 113-14 (1967). Rather, a federal court's inquiry into a state evidentiary ruling is limited to an examination of whether the state violated a federally guaranteed right, *Nordskog v. Wainwright*, 546 F.2d 69, 72 (5th Cir. 1977), such as the denial of fundamental fairness. *Hall v. Wainwright*, 733 F.2d 766, 770 (11th Cir. 1984). "As a guideline for applying the criterion of fundamental fairness, the erroneous admission of prejudicial evidence can justify habeas corpus relief only if it is material in the sense of a crucial, highly significant factor." *Dickson v. Wainwright*, 683 F.2d 348, 350 (11th Cir. 1982) (citations omitted). The category of infraction that violates fundamental fairness is narrowly defined. *Estelle v. McGuire*, 502 U.S. at 73. For the most part, an evidentiary ruling simply raises no question of constitutional magnitude.

> A federal habeas petition may be entertained only on the ground that
> a petitioner is in custody in violation of the Constitution or laws or
> treaties of the United States. 28 U.S.C. § 2254(a). A state's
> interpretation of its own laws or rules provides no basis for federal
> habeas corpus relief, since no question of a constitutional nature is
> involved. *Bronstein v. Wainwright*, 646 F.2d 1048, 1050 (5th Cir.
> 1981). State courts are the ultimate expositors of their own state's
> laws, and federal courts entertaining petitions for writs of habeas
> corpus are bound by the construction placed on a state's criminal
> statutes by the courts of the state except in extreme cases. *Mendiola v.
> Estelle*, 635 F.2d 487, 489 (5th Cir. 1981).

*McCullough v. Singletary*, 967 F.2d 530, 535-36 (11th Cir. 1992), *cert. denied*, 507 U.S. 975

(1993). Correll fails to show that the introduction of the photographs and blood-stained

items violates his right to a fundamentally fair trial because the evidence against Correll

is so overwhelming.

Ground XIII

> Introduction of collateral crime evidence and evidence of "bad
> character" violated Mr. Correll's right to a fair trial.

Correll asserts that, "[o]ver defense objection, the State introduced collateral

crime evidence, namely Mr. Correll's having previously punctured the tires of [his

ex-wife]'s car." *Correll I*, 523 So. 2d at 566, establishes the following facts:

> Correll's next point involves the admission of testimony that Correll
> had slashed Susan Correll's tires some two years prior to the murders
> in light of evidence that on the night of the murders, the tires of the
> man Susan was then dating had been slashed outside the ABC Bar
> sometime after Correll had seen the two of them inside the bar.
> Before trial, the state filed a notice of intent to offer similar fact
> evidence, and a hearing was conducted. Defense counsel objected to
> the admission of this testimony on the ground that it was too remote
> in time to be relevant, but the trial court ruled it admissible as it went
> toward lack of mistake, identity and motive.

- 21 -

A review of Correll's brief on direct appeal (Respondent's Exhibit XXXV, Point IX at 84) shows that, in presenting this ground to the state court, Correll argued only that the evidence violated Florida's *Williams* rule,[14] codified at Section 90.404, Florida Statutes, which precludes the admissibility of other crimes or wrongs if the "evidence is relevant solely to prove bad character or propensity."  Correll failed to alert the state court that admitting testimony about the earlier incident violated a constitutional right. As a consequence, Correll's federal claim—that "Mr. Correll was denied his fundamental right to a fair trial when the State introduced irrelevant and prejudicial evidence"—is both unexhausted and procedurally barred from federal review unless Correll can overcome the procedural default.  *See Anderson v. Harless*, 459 U.S. at 6 ("[T]he habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim."), and *Picard v. Connor*, 404 U.S. at 275 ("We emphasize that the federal claim must be fairly presented to the state courts.").  Correll presents no argument to overcome the procedural default. Consequently, ground XIII is procedurally barred from federal review on the merits.[15]

---

[14]  *Williams v. State*, 110 So. 2d 654 (Fla.), *cert. denied*, 361 U.S. 857 (1959).

[15]  Even if the federal claim was not procedurally barred from federal review, Correll procedurally defaulted the underlying state law claim by failing to timely object at trial.  *Correll I*, 523 So. 2d at 566 (emphasis added), rejects the state law ground with the following analysis:

> Correll argues that this testimony violated section 90.404, Florida Statutes (1985), which prohibits the introduction of similar fact evidence when it is used solely to prove bad character or propensity.  **However, the point is not properly before this Court because of defense counsel's failure to object to the testimony at trial.**  Even when a prior motion in limine has been denied, the failure to object at the time

(continued...)

<u>Ground V (A)</u>
Trial counsel was rendered ineffective by court rulings in violation
of the Sixth, Eighth, and Fourteenth Amendments [in the] Guilt-
Innocence Phase.

Correll maintained his innocence and presented the defense that someone else committed the murders.  He speculated that the murders were the result of Susan's use of drugs.  Correll challenges the trial court's precluding the introduction of evidence about Susan's alleged drug use.  The prosecution filed a motion *in limine* (Respondent's Exhibit XXVIII at 3944) to preclude testimony about Susan's history of using drugs.  In a pre-trial hearing, the trial court "reserv[ed] ruling on the motion *in limine* until such time as I have enough information concerning relevancy and the questions raised." (Respondent's Exhibit XVIII at 2187)  Consistent with the pre-trial ruling, during trial defense counsel requested a side-bar conference at which he announced his desire to cross-examine a witness about Susan's prior drug use.  The trial court rejected the request based on a lack of relevance.  (Respondent's Exhibit V at 542-44)

---

[15](...continued)
collateral crime evidence is introduced waives the issue for appellate review. *Phillips v. State*, 476 So. 2d 194 (Fla. 1985); *German v. State*, 879 So. 2d 1013 (Fla. 4th DCA), *cert. denied*, 388 So. 2d 1113 (Fla. 1980).  Moreover, even if an objection had been made, the testimony was sufficiently relevant to show that Correll had demonstrated hostility toward Susan on the night of the murders by slashing her boyfriend's tires.  Moreover, this evidence tended to prove that Correll was the killer because the keys to Marybeth Jones's car, which had been stolen on the night of the murders, were found on the trunk lid of the car with the slashed tires.

Correll asserted this issue in his motion for post-conviction relief. The post-conviction court rejected the claim as one that "could have been raised on direct appeal."

> Claim I, that counsel was rendered ineffective by judicial rulings and prosecutorial improprieties, is procedurally barred as it involves matters which either were or could and should have been raised on direct appeal. *Clark v. State*, 460 So. 2d 886 (Fla. 1994 ); *Mikenos v. State*, 460 So. 2d 359 (Fla. 1984). Although cast in the guise of ineffective assistance of counsel, this claim involves nothing more than a dispute over several of this court's rulings at trial, two of which were raised on direct appeal . . . and another which could have been raised on direct appeal (the preclusion from eliciting, on cross-examination of a state witness, the fact that Susan Correll smoked marijuana on the night she was murdered).

(Respondent's Exhibit XXXVII, Claim I at 1-2)  In affirming the post-conviction court's decision, *Correll II*, 558 So. 2d at 426 n.6, applied the same reasoning for not reviewing the claim.

The state court specifically found this claim procedurally defaulted and declined addressing the merits of this claim.  Correll presents no argument to overcome the procedural default. Consequently, ground V(A) is procedurally barred from federal review on the merits.

### Ground VIII

The cold, calculated, and premeditated aggravating circumstance was improperly applied in violation of the Eighth and Fourteenth Amendments.

### Ground IX

The heinous, atrocious, or cruel aggravating circumstance was improperly applied in violation of the Eighth and Fourteenth Amendments.

Correll challenges the application of both the "cold, calculated, and premeditated" ("CCP") aggravating circumstance (ground VIII) and the "heinous, atrocious, or cruel" ("HAC") aggravating circumstance (ground IX). Correll's ground VIII consists of a single paragraph less than a half-page long and ground IX consists of two paragraphs less than a page long. Correll admits that both grounds are procedurally barred. These two grounds are addressed jointly because Correll conflates his arguments for these separate aggravating circumstances.

A. CCP:

Correll contends that the CCP aggravating circumstance is unconstitutionally vague and that the trial judge improperly applied the aggravator. Correll never alleged, either at trial or on direct appeal, that the CCP aggravating circumstance was unconstitutionally vague.[16] Although he asserted his vagueness challenge in the state post-conviction proceeding, Correll concedes that the post-conviction court rejected the vagueness claim as procedurally barred. The respondent concurs stating, "This claim is procedurally defaulted for habeas purposes because it was not raised on direct appeal from Correll's convictions and sentences." (Response at 51, Doc. 120) Correll offers no rebuttal in his reply. (Doc. 123)

---

[16] When *Correll I* issued in 1988, Florida law rejected challenging the CCP aggravator for vagueness. *See Brown v. State*, 565 So. 2d 304, 308 (Fla. 1988), *cert. denied*, 498 U.S. 992 (1990), *abrogated by Jackson v. State*, 648 So. 2d 85 (Fla. 1994).

In his Rule 3.850 motion to vacate, Correll asserted his "improperly applied" challenge to the CCP aggravating circumstance, which challenge was rejected by the post-conviction court as procedurally barred (Respondent's Exhibit XXXVII at 11-12):

> Claim XVIII, that the cold, calculated, and premeditated aggravating factor was improperly applied is procedurally barred as it should have been raised on direct appeal. *Henderson v. Dugger*, 522 So. 2d 835 (Fla. 1988). Recent decisions of the Florida Supreme Court that this factor involves a careful plan or prearranged design do not represent a change in the law. *Eutzy v. State*, 541 So. 2d 1143 (Fla. 1989). This court finds that upon eliminating this aggravating factor and re-weighing the aggravating and mitigating factors it would still impose a sentence of death for the murder of Tuesday.

*Correll II*, 558 So. 2d at 426-27 n.6, agreed with the post-conviction court that Correll should have raised this claim on direct appeal. As a consequence, Correll's ground VIII is procedurally barred from federal review on the merits.[17]

B. HAC:

Correll asserts two challenges to the HAC aggravating circumstance. First, he contends that the HAC aggravating circumstance "is unconstitutionally vague." Correll never alleged, either at trial or on direct appeal or post-conviction, that the HAC

---

[17] Because Correll is represented by counsel, a court is not required to liberally construe the petition. Nevertheless, Ground VIII presents an "insufficiency-of-the-evidence" argument in a single sentence. The cursory argument fails to specify if the challenge to the CCP aggravating circumstance is addressed to a particular victim. In his initial brief on direct appeal (Respondent's Exhibit XXXV at 139-41), Correll specifically challenged the trial court's finding the CCP aggravating circumstance as applied to Tuesday. *Correll I*, 523 So. 2d at 568, summarily rejected the insufficiency-of-the-evidence argument stating, "We also find no error with respect to the rest of the aggravating factors and the lack of mitigating factors." Neither Correll nor the respondent recognizes that this "insufficiency-of-the-evidence" claim, as applied to Tuesday, is not procedurally barred. Nevertheless, Correll is entitled to no relief because the state's evidence was more than sufficient to prove the CCP aggravating circumstance as applied to his murdering his five-year-old daughter.

aggravating circumstance was unconstitutionally vague.  As a consequence, a challenge

to the HAC aggravating circumstance based on vagueness is both unexhausted and

procedurally barred.

Correll's second contention is that "[t]he trial court improperly found the HAC

aggravating circumstance, as the State did not prove its existence beyond a reasonable

doubt."  Citing the post-conviction proceedings, Correll concedes that this claim was

rejected as procedurally barred.  The respondent concurs stating, "This claim is

procedurally defaulted for habeas purposes because it was not raised on direct appeal."

(Response at 52, Doc. 120)  Correll offers no rebuttal in his reply.  (Doc. 123)

The "insufficiency-of-the-evidence" argument, which Correll presents in a single,

cursory sentence, is not procedurally barred.  In his initial brief on direct appeal

(Respondent's Exhibit XXXV at 144-46), Correll specifically challenged the trial court's

finding the HAC aggravating circumstance as applied to Susan, Tuesday, and Mrs.

Hines.  The answer brief (Respondent's Exhibit XXXV) supports the validity of the

HAC aggravating circumstance as applied to Susan (pp. 131-33), Tuesday (pp. 145-46),

and Mrs. Hines (pp. 150-53).  *Correll I*, 523 So. 2d at 568, summarily rejected the

insufficiency-of-the-evidence argument stating, "We also find no error with respect to

the rest of the aggravating factors and the lack of mitigating factors."  Neither Correll

nor the respondent recognizes that this "insufficiency-of-the-evidence" challenge to the

HAC aggravating circumstance is not procedurally barred.  Nevertheless, Correll is

entitled to no relief because the state's evidence was more than sufficient to prove the

HAC aggravating circumstance as applied to his murdering Susan (his ex-wife), Tuesday (his little five-year-old daughter), and Mrs. Hines (his ex-mother-in-law).

C.  CCP and HAC:

Correll alleges that both the CCP and the HAC aggravating circumstances are based on improper jury instructions and counsel's ineffectiveness.  Both allegations are procedurally barred.

Correll alleges that the jury was improperly instructed on both the CCP and the HAC aggravating circumstances.  On direct appeal Correll asserted a challenge to neither the CCP nor the HAC jury instructions.  The post-conviction court determined that Correl's jury instruction challenge was procedurally barred (Respondent's Exhibit XXXVII at 11):

> Claim XVII, that Correll's sentencing jury was improperly instructed on the especially heinous, atrocious, or cruel aggravating factor, is procedurally barred as it should have been raised on direct appeal. *Adams v. State*, 543 So. 2d 1244 (Fla. 1989); *Marich v. State*, 542 So. 2d 980 (Fla. 1989).  In any event, the claim is without merit as *Maynard, supra,* does not affect Florida's sentencing procedure.  *Clark, supra;*[18] *Smalley v. State*, 546 So. 2d 720 (Fla. 1989); *Smith, supra.*  This court finds that upon eliminating this aggravating factor and re-weighing the aggravating and mitigating factors it would still impose a sentence of death for the murders of Susan Correll, Tuesday Correll, and [Mrs.] Hines.

*Correll II*, 558 So. 2d at 426-27 n.6, agreed with the post-conviction court that Correll should have raised his jury instruction claim on direct appeal.  As a consequence,

---

18  *Clark v. Dugger*, 559 So. 2d 192 (Fla. 1990).

Correll's challenge to both the CCP and the HAC jury instruction is procedurally barred from federal review on the merits.

Ground IX also contains a cursory allegation of ineffective assistance of counsel for not challenging both the CCP (ground VIII) and the HAC (ground IX) aggravating circumstances (Third Amended Petition at 49 Doc. 119):

> The jury's death recommendations in Mr. Correll's case were tainted by Eighth Amendment error because the jury received constitutionally inadequate instructions regarding the cold, calculated, and premeditated aggravating factor and the heinous, atrocious or cruel aggravating factor. *Godfrey v. Georgia*, 446 U.S. 420 (1980); *Furman v. Georgia*, 408 U.S. 238 (1972); *Shell v. Mississippi*, 498 U.S. 1 (1990). Any failure by trial or appellate counsel to preserve and raise these fundamental issues constitutes ineffective assistance of counsel. Counsel is ineffective when she fails to challenge the legality of an aggravating circumstance being used to enhance a sentence. *Starr v. Lockhart*, 23 F.3d 1280 (8th Cir. 1994), *cert. denied*, 513 U.S. 995, 115 S. Ct. 499, 130 L. Ed. 2d 409 (1994).

In his Rule 3.850 motion to vacate Correll never asserted that trial counsel rendered ineffective assistance by not challenging either the CCP or the HAC aggravating circumstances. (Respondent's Exhibit XXXVII at 229-46 (HAC) and at 246-259 (CCP)) In his state petition for extraordinary relief in the Florida Supreme Court under Rules 9.030(a)(3) and 9.100(a), Florida Rules of Appellate Procedure (Respondent's Exhibit XXXVIII), Correll never asserted that appellate counsel rendered ineffective assistance by not challenging either the CCP or the HAC aggravating circumstances. (Respondent's Exhibit XXXVIII at 84-101 (HAC) and at 101-15 (CCP)) Correll concedes that these claims were "deemed procedurally barred." Correll presents no argument to overcome the procedural bar.

Additionally, even if Correll could both overcome the procedural bar and prevail

on his challenges to the CCP and HAC aggravating circumstances, Correll would gain

no relief because, in the 1990 order denying Correll's Rule 3.850 motion to vacate, the

post-conviction court specifically re-weighed the remaining aggravating and mitigating

circumstances and determined that Correll would still receive a sentence of death for

each victim.  *See Clemens v. Mississippi*, 494 U.S. 738, 744-49 (1990) (permitting the

re-weighing of aggravating and mitigating circumstances after determining that an

invalid aggravating circumstance was considered when the death sentence was

imposed).

Ground XV

   Mr. Correll was denied a fair trial and sentencing due to
presentation of false or misleading evidence and trial counsel's
ineffectiveness in fail[ing] to investigate.

  The prosecution presented the testimony of Judith Bunker, an employee of the

Orange County Medical Examiner's Office.  The trial court accepted Ms. Bunker as an

expert witness for blood spatter analysis.  Correll alleges that newly discovered evidence

reveals that the expert witness misrepresented her educational background.  This

Section 2254 petition was stayed and administratively closed while Correll presented

his newly-discovered evidence to the state court in another Rule 3.850 motion to vacate,

which claim *Correll III* rejected.

  In addition to challenging the qualification of the expert witness, ground XV

alleges that trial counsel rendered ineffective assistance by not properly investigating the

- 30 -

expert witness's background.  Correll never presented the ineffectiveness claim to the state court.  Neither the second Rule 3.850 motion to vacate (Respondent's Exhibit XXXIX) nor the transcript of the hearing (*Id.*) nor Correll's initial brief on appeal (Respondent's Exhibit XL) nor *Correll III* asserts or addresses an allegation that trial counsel rendered ineffective assistance for not investigating Ms. Bunker's educational background.  As a consequence, Correll's ineffective assistance of counsel claim is both unexhausted and procedurally barred from federal review unless Correll can overcome the procedural default.  *See Anderson v. Harless*, 459 U.S. at 6 ("[T]he habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim."), and *Picard v. Connor*, 404 U.S. at 275 ("We emphasize that the federal claim must be fairly presented to the state courts.").  Correll presents no argument to overcome the procedural default.  Consequently, this component of ground XV is procedurally barred from federal review on the merits.[19]

## IV.  STANDARD OF REVIEW

This federal action began in July, 1990, when Correll petitioned for the writ of habeas corpus.  Because this action began before April 24, 1996, this action is not controlled by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Instead this petition is reviewed under pre-AEDPA law.  *Lindh v. Murphy*, 521 U.S. 320, 336 (1997);  *Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000), *cert. denied* 532 U.S.

---

[19]  The merits of Correll's challenge to the expert witness's testimony is addressed later.

926 (2001).  As a consequence, the deference now routinely accorded a state court's

decision is inapplicable.[20]  Instead, Correll is entitled to a *de novo* review of the state

courts' decisions on both questions of law and mixed questions of law and fact, *Mincey*,

206 F.3d at 1131, but not for findings of fact.

Even though this action is controlled by pre-AEDPA law, Correll faces a

substantial obstacle to overcome the state courts' findings of fact, which are entitled to a

presumption of correctness.

> The state court's factual findings are generally entitled to a presumption of
> correctness and may be ignored only if the petitioner shows by clear and
> convincing evidence that the state court's determination was not "'fairly
> supported by the record.'"  *Griffin v. Wainwright*, 760 F.2d 1505, 1511 (11th Cir.
> 1985) (quoting pre-AEDPA § 2254(d)).  This presumption is equally applicable
> to state appellate court findings of fact.  *See, e.g., Sumner v. Mata*, 449 U.S. 539,
> 549, 101 S. Ct. 764, 770, 66 L. Ed. 2d 722 (1981).

*Johnson v. Alabama*, 256 F.3d 1156 (11th Cir. 2001), *cert. denied sub nom, Johnson v. Nagle*,

535 U.S. 926 (2002).  *See also Marshall v. Lonberger*, 459 U.S. 422, 432 (1983) ("This

deference requires that a federal habeas corpus court more than simply disagree with

the state court before rejecting its factual determinations.  Instead, it must conclude that

the state court's findings lacked even 'fair support' in the record.").

Even though this action is controlled by pre-AEDPA law, the review of each

direct appeal claim is governed by the "legal landscape" of 1988, when *Correll I* issued,

and each ineffective assistance of counsel claim is governed by the "legal landscape" of

---

[20]  To obtain relief Section 2254(d) now requires a petitioner to show that the state court's decision was
either (1) contrary to, or involved an unreasonable application of, clearly established Federal law as determined
by the Supreme Court of the United States or (2) an unreasonable determination of the facts.

1990, when *Correll II* issued. *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997) ("Lambrix's conviction became final on November 24, 1986, when his time for filing a petition for certiorari expired. Thus, our first and principal task is to survey the legal landscape as of that date . . . .").

Additionally, pre-AEDPA law governs whether an evidentiary hearing is required, as Correll requests. Even under pre-AEDPA law a petitioner is not always entitled to an evidentiary hearing. *Atkins v. Singletary*, 965 F.2d 952, 957-58 (11th Cir. 1992), *cert. denied*, 515 U.S. 1165 (1995), teaches that an evidentiary hearing is unnecessary if the petitioner's allegations lack merit.

> Atkins argues that, under *Blackledge v. Allison*, 431 U.S. 63, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977), the district court was required to hold an evidentiary hearing to give Atkins an opportunity to prove his claims.[4]  We do not think so.
>
> > [4] Atkins has failed to state precisely which issues require an evidentiary hearing or why those issues warrant an evidentiary hearing. Based on Atkins' footnotes, *see* Brief for Petitioner at 10 n. 4; Reply Brief for Petitioner at 14 n. 9, and the string citations to the record contained therein, Atkins seems to complain about the following issues: ineffective assistance of counsel for failing to investigate the scene of the crime, for failing to use an expert to negate specific intent, for failing to use an expert to prove the involuntariness of Atkins' confession, and for failing to use expert and lay testimony to show nonstatutory mitigating circumstances; no Miranda waiver; and procedural-default questions related to cause and prejudice.
>
> "A petitioner is entitled to an evidentiary hearing if he alleges facts which, if true, would warrant habeas relief." *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991), *cert. denied* 502 U.S. 1105, 112 S. Ct. 1199, 117 L. Ed. 2d 439 (1992). And we must accept as true the factual assertions made by a habeas petitioner when determining

whether an evidentiary hearing is required.  *See, e.g., Smelcher v. Attorney General of Alabama*, 947 F.2d 1472, 1478 (11th Cir. 1991); *Agan v. Dugger*, 835 F.2d 1337, 1338 (11th Cir. 1987).  But after reviewing Atkins' allegations and accepting as true his factual allegations, we conclude that he would be due no relief and, therefore, that Atkins is entitled to no evidentiary hearing.[5]

> [5] Even the Supreme Court in *Blackledge v. Allison*, 431 U.S. 63, 76, 97 S. Ct. 1621, 1630, 52 L. Ed. 2d 136 (1977), recognized that allegations that were palpably incredible, patently frivolous or false would warrant no evidentiary hearing.  Because we think that Atkins' claims and allegations are, at best, meritless and, at worst, frivolous, the district court committed no error by summarily disposing of Atkins' petition.

*See also Strickland v. Washington*, 466 U.S. at 700 ("The state courts properly concluded that the ineffectiveness claim was meritless without holding an evidentiary hearing.").

Even after considering his asserted new evidence, Correll's allegations lack merit.

Consequently, no evidentiary hearing is required.

Although the deference accorded state court decisions under the AEDPA is inapplicable, the discussion of each ground commences with the state court's analysis, which, although not controlling, is instructional.

## V.  PRE-TRIAL GROUND

### Ground XI

The trial court failed to excuse for cause venire members Beiler and Cullen in violation of the Sixth, Eighth, and Fourteenth Amendments.

Correll alleges that two members of the jury venire, Ms. Beiler and Ms. Cullen, were each unsuitable to serve as a juror because of their responses during *voir dire*.

Correll complains "that veniremember Beiler responded 'that without a doubt' she

would have difficulty voting for life if Mr. Correll was found guilty of murder."  Correll complains that "venireperson Cullen also indicated she would 'probably' find it difficult to vote for life."  Neither Beiler nor Cullen were stricken for cause.  Correll argues that "[b]ecause the views expressed by Beiler and Cullen prevented and substantially impaired their ability to be fair and impartial, they should have been stricken for cause."

"[T]he standard for determining whether prospective jurors may be excluded for cause based on their views on capital punishment . . . is 'whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Gray v. Mississippi*, 481 U.S. 648, 658 (1987), quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).  A reviewing court must consider a prospective juror's *voir dire* responses based on the entire *voir dire* and not based on an isolated question.  *See, e.g., Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1198-1201 (11th Cir. 2012) (reviewing responses by a member of the venire based on each member's *voir dire* as a whole—regarding whether they could impose a sentence of death—and not based on the member's response to one question).  The *voir dire* of Beiler, in proper context, is as follows (Respondent's Exhibit I at 80-83):

> [Defense Counsel]:  The Judge is going to instruct you on the different aggravating factors and on mitigating factors and on the burden of proof, and he's then going to have you decide whether the death penalty should be considered or not.  Do you think that you could – you would find it difficult to vote for life after [being] given those instructions from the Court?
>
> Ms. Beiler:  For life?
>
> [Defense Counsel]:  Yes.

Ms. Beiler:  You are trying to confuse me.

[Defense Counsel]:  Not really.  I don't mean to.

Ms. Beiler:  I guess it's just lawyer's terms.  I don't know.

[Defense Counsel]:  What don't you understand?

Ms. Beiler:  Okay.  What are you planning on asking me?

[Defense Counsel]:  If the Judge instructs you on the aggravating circumstances and the mitigating circumstances and instructs you on the burden of proof, and then you have to go back and decide whether to consider the death penalty or not, would you have a difficult time in considering life rather than the death penalty?

Ms. Beiler:  Once back there talking and considering the death, then I will have to consider it.  And then also you put in there considering, which we are not really pointing out, that it is going to be.  So what I will have to do, I will have to evaluate and consider it just as much as life or death.

[Defense Counsel]:  Okay.  You told the Prosecutor that you are for the death penalty up to a point.  Could you explain to me what that means a little bit more?

Ms. Beiler:  To me, I have never been in this situation, but if he or she is, you know, proven — do you understand what I'm saying — totally proven, then I do, I will consider the death penalty.

[Defense Counsel]:  Do you think anyone who's convicted of  first-degree murder should be given the death penalty?

Ms. Beiler:  If they are proven.

[Defense Counsel]:  All right.  What I'm asking — when I ask you about [what] the aggravating circumstances is under the law, the Judge is going to instruct you that if we get to the second phase, before you consider the death penalty you will be instructed that you will need to find beyond a reasonable doubt that these aggravating circumstances are present.

If you didn't find them to be present, would you have a difficult time still voting for life if an individual had been convicted of first-degree murder?

Ms. Beiler:  Yeah, without a doubt, you know.

The Court:  Let me ask you a question in this regard, please.  That question, because of its length and because of it being asked kind of backwards, it might be confusing to you, but the law in Florida is that a person who commits first-degree premeditated murder, if the jury after a trial finds beyond a reasonable doubt that that person did commit first-degree premeditated murder, does not automatically receive the death penalty.

Then we go to the jury and I will be explaining certain additional aggravating factors that also would have to be proved before the death penalty could be considered, and mitigating factors that the jury can consider in order to vote for not imposing a death penalty or life in prison, and what both counsels are asking you in a roundabout way is whether or not you will put aside your personal feelings concerning when the death penalty should be imposed or not imposed and follow the instructions of the Court and apply it to the facts in this case in making a determination in accord with the law.  Could you do that?

Ms. Beiler:  Yes, I could.  You explained it a lot easier.

Defense counsel asserted no challenge for cause at the conclusion of Ms. Beiler's individual *voir dire*, but at the conclusion of the individual questioning of all of the veniremen, defense counsel challenged Ms. Beiler for cause, which challenge was rejected.  (Respondent's Exhibit IV at 421-22)

The *voir dire* of Ms. Cullen, in proper context, is as follows (Respondent's Exhibit II at 146-51):

[Prosecutor]:  Afternoon, ma'am. The Judge indicated earlier that one of the possible penalties in this case could be the death penalty.  We need to know, how do you feel about the death penalty?

Ms. Cullen:  You mean do I approve of it?

[Prosecutor]:  Approve of it, dislike it?

Ms. Cullen:  I approve of it.

[Prosecutor]:  Do you understand not all cases involving first-degree murder warrant the imposition of the death penalty?

Ms. Cullen:  Yes.

[Prosecutor]:  Because of that, we have certain laws in the State and the judge will instruct you according to those laws.  He will instruct you as to certain aggravating and certain mitigating factors.  Then you will take the facts of the case and the evidence and apply those against the Court's instructions to arrive at a recommendation.  If the facts of this case would warrant the imposition of the death penalty according to the law as instructed to you by the Court, could you vote to recommend the death penalty?

Ms. Cullen:  Yes.

[Prosecutor]:  On the other hand, if the facts of this case did not warrant the death penalty but warranted a sentence of life imprisonment, could you recommend to the Court according to the laws of this state that life imprisonment be imposed?

Ms. Cullen:  Yes.

[Prosecutor]:  What, I'm simply asking, ma'am, in nutshell is lay aside your personal feelings about the death penalty and follow the law concerning this imposition or non-imposition.  Can you do that?

Ms. Cullen:  Yes.

. . . .

[Defense Counsel]:  You said to the prosecutor that you approved of the death penalty.  Could you be a little more specific and explain that for me?

Ms. Cullen:  Well, I think that if someone deserves the death penalty instead of being in prison for, say, seven to ten years and walk out — being a parent of kids, I think it puts a little more implant in their

mind.  It's going to be a lot harder than spending seven or eight years in prison.

[Defense Counsel]:  Okay.  Do you understand that the Judge is going to explain to you certain aggravating and mitigating factors, and he will explain to you what the burden of proof is, and then you will only decide at that point whether to consider the death penalty or life in prison.  Do you understand that?

Ms. Cullen:  You lost me.

The Court:  You lost me too.

[Defense Counsel]:  Okay, let me go back.  Sorry about that.  During the first phase, ma'am you are only concerned with the guilt or innocence of Jerry Correll, you are not concerned with the sentence at all.  Do you understand that?

Ms. Cullen:  Right.

[Defense Counsel]:  If you come back guilty of second degree murder or not guilty or guilty of manslaughter, you won't even get to the second phase.  Do you understand that?

Ms. Cullen:  Uh-huh.

[Defense Counsel]:  Okay.  If by some chance you did, the jury were to come back guilty of first-degree murder, and we got to the penalty phase, the Judge would explain to you certain aggravating factors, certain mitigating factors, the burden of proof and the law, and you understand that you would have to follow his instructions and then decide on either the death penalty or life in prison?

Ms. Cullen:  Right.

[Defense Counsel]:  Do you think you would have a problem voting for life in prison?

Ms. Cullen:  Probably.

[Defense Counsel]:  Probably.  Do you feel like anyone who is convicted of first-degree murder should automatically get the death penalty?

Ms. Cullen:  I think it depends on the circumstances of the case itself.

[Defense Counsel]:  So you would follow the law based on —

Ms. Cullen:  You have to.

[Defense Counsel]:  — what the judge explains to you?

Ms. Cullen:  Yeah.

[Defense Counsel]:  Okay.  I have nothing further.

. . . .

The Court:  Counsel approach the bench, please.
(Whereupon, counsel approached the bench, and the following proceedings were had outside the hearing of the jury):

[Defense Counsel]:  I would challenge Ms. Cullen on the grounds that she said she would have a problem voting for life in prison probably, in fact, have a problem voting for life in prison, which means she would have difficulty applying the law and voting for life in prison, and I think that is the standard, and I would move to challenge her for cause based on that.

The Court:  State wish to respond?

[Prosecutor]: Yes, Your Honor.  When questioned specifically whether or not she would follow the law, she unequivocally said she could.  I think that her answer to that particular question might stem from confusion concerning the question, and I think she meets the *Witt* standard.  She said she would consider all penalties.  She said she could vote for life.  At the end of the other question she indicated she would have to wait and listen to the instructions by the court.

The Court:  I agree.  We seem to ask the same questions four or five different ways, and even though she indicated that she would probably have difficulty imposing life, she immediately thereafter indicated that she does not feel that [the] death penalty should be automatic, she would consider all the circumstances, not only could she, she would follow the law as spelled out by the court.  So the challenge is denied.

At Correll's request, the trial court permitted both the prosecution and the defense two additional peremptory challenges.  (Respondent's Exhibit IV at 425)  The defense retained one peremptory challenge when jury selection concluded.  (*Id.* at 433)  Neither Ms. Beiler nor Ms. Cullen served on the jury.  (*Id.* at 435)

*Correll I*, 523 So. 2d at 564 n.*, summarily rejected this ground without elaboration as one of ten grounds the court found "to be without merit . . . ."  That ruling is correct.

"The purpose of *voir dire* is to ascertain whether potential jurors can render a verdict solely on the basis of evidence presented and the charge of the trial court."  *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir. 1987).  The trial court found that both Beiler and Cullen would follow the court's instructions on the law and consider the circumstances in determining a proper sentence.  *Wainwright v. Witt*, 469 U.S. at 428, teaches that a trial judge's determination of potential juror bias is a finding of fact entitled to deference:

> Last Term, in *Patton [v. Yount*, 467 U.S. 1025, 1038 (1984)],  we held that a trial judge's finding that a particular venireman was not biased and therefore was properly seated was a finding of fact subject to § 2254(d). We noted that the question whether a venireman is biased has traditionally been determined through *voir dire* culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.[9]
>
> [9] In *Reynolds v. United States*, 98 U.S. 145, 156-157, 25 L.Ed. 244 (1879), this Court stated:

> "[T]he manner of the juror while testifying is
> oftentimes more indicative of the real character
> of his opinion than his words.  That is seen
> below, but cannot always be spread upon the
> record. Care should, therefore, be taken in the
> reviewing court not to reverse the ruling below
> upon such a question of fact, except in a clear
> case."

As a consequence, the trial court properly refused to strike either Beiler or Cullen

for cause.  Correll is entitled to no relief based on Ground XI.

## VI.  GUILT PHASE

### Ground I
Trial counsel's conflict of interest violated the Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution.

Ground I alleges that Correll was denied his right to counsel, not that he was

denied the effective assistance of counsel.  This distinction causes a different level of

proof, as discussed below.

Two weeks before the trial commenced, the prosecutor filed a supplemental

witness list (Respondent's Exhibit XXIX at 4036), on which was listed Lawrence

Anthony Smith as a witness.[21]  Smith faced criminal charges in an action completely

unrelated to Correll's action.  Smith was represented by William Kinane, an assistant

public defender from the same Public Defender's Office that represented Correll.

Because both Smith and Correll were represented by attorneys from the same Public

---

[21]  Smith and Correll regularly conversed while confined in adjoining cells in the Orange
County jail.  Smith testified about some of their conversations, which contain incriminating
admissions by Correll.

Defender's Office, the trial court appointed a private attorney to advise Smith about a

potential conflict of interest.  (*Id.* at 4037)  At a hearing (Respondent's Exhibit XXX at

4162-80)—which included the participation of Smith, both his assigned public defender

and his newly-appointed private attorney, the prosecutor, and Correll's public

defender—the trial judge thoroughly reviewed the possibility of a conflict of interest

and recognized that if Smith would not waive his attorney-client privilege of

confidentiality, the Public Defender's Officer would likely have to withdraw from at

least one if not both of the actions.  (*Id.* at 4165)  Smith waived his attorney-client

privilege of confidentiality.  (*Id.* at 4168-69)  The possibility of a conflict was discussed

further (*Id.* at 4173-76):

> The Court:  The only thing I would like to discuss is whether there is,
> in fact, a continuing potential for conflict should the defense find it
> necessary to call a member of your own law firm to the witness stand,
> that being another public defender, to impeach or rebut statements
> made by this proposed witness.
>
> [Defense Counsel]:  Well, I suppose there is always a continuing
> conflict to some extent in that Mr. Kinane is privy to discussions that
> we have had in the office in regard to our representation of Mr.
> Correll.  Mr. Kinane, to my knowledge, has on occasion participated
> in discussions that I have had with her people and him about the
> Correll case.  I can't cite to the court right off hand anything
> specifically that was said or discussed.  Mr. Kinane, in fact, may have
> had other discussions with other people in our office that relate to the
> Correll case including privileged communications from Mr. Correll as
> to our strategy, that kind of thing.  Whether or not there is anything of
> value that comes out of that, I can't say right offhand.
>
> Secondly, I don't know whether the state would want to — Well, I
> don't know whether any of those things will come up, but they
> certainly could relate to a conflict of interest down the road
> somewhere.  In other words, Mr. Kinane, in essence, is supposed to
> know about his case just like we are supposed to know about the

Lawrence Smith case.  I do know things about the Lawrence Smith case and I am sure he knows things about the Jerry Correll case.  I have discussed it with him from time to time.

The Court:  Is the state agreeing not to call William Kinane as a witness in other cases that also apply to the Jerry Correll case?

[Prosecutor]:  That's correct.  The state is agreeing not to call William Kinane as a witness.

[Defense Counsel]:  Let me ask something else.  If Mr. Kinane is called as a witness on behalf of Mr. Correll, then will they be able to go into any of those matters that were in the deposition?  I would like to make that clear if that is going to be the case.  I think that those would remain privileged communications because that would, in fact, make Mr. Kinane a witness against his ex-client.

The Court:  The privilege that we are referring-to [is] of the client [and] is not a privilege of the attorney.  The client has waived that privilege.

[Defense Counsel]:  Mr. Correll certainly did not waive any privilege, the privilege to the extent of every member of the Public Defender's Office.

The Court:  You are referring to information that Mr. Kinane may have concerning the Correll case?

[Defense Counsel]:  That is correct.  I would think Mr. Correll's privilege was not waived.  Mr. Kinane is also a representative of the Public Defender's Office and Mr. Correll would have to waive that privilege, not Mr. Smith.  That is important.
The Court:  Well, in this case, I am going to deny the motion to withdraw.

The motion to withdraw by Correll's public defender was denied and subsequently the Public Defender's Office was removed from representing Smith.  After an extensive discussion about the possibility of a conflict occurring–despite the removal of the Public Defender's Office from representing Smith and Smith's waiver of the attorney-client privilege of confidentiality–the trial judge agreed with the prosecutor's

summary of the parameters of what could happen if the defense called Smith's former

public defender as a witness to impeach Smith's testimony (Respondent's Exhibit XXX

at 4179):

> The only areas I think we can legitimately inquire into, unless, as
> Your Honor says, the door has been opened by the defense, would be
> the areas of impeachment that he knows about Mr. Smith.  However,
> as far as anything that Mr. Kinane learned about Jerry Correll, any
> statements that he learned from Mr. Correll as a result of his
> relationship with the Public Defender's Office and Mr. Kinane, that
> wouldn't be a fair area of perusal.  Even at a deposition, if Mr. Kinane
> feels that a question is inappropriate, he can refuse to anser that
> question and it can be certified.

In other words, the defense could present Mr. Kinane as a witness to impeach Smith,

and the prosecution agreed to ask Mr. Kinane no question about the Correll action.

*Correll I*, 523 So. 2d at 564 n.*, summarily rejected this ground without

elaboration as one of ten grounds the court found "to be without merit . . . ."  The post-

conviction court rejected this ground as one that was raised on direct appeal as part of

Correll's allegation of trial court error in denying defense counsel's motion to withdraw.

(Respondent's Exhibit XXXVII at 6)  *Correll II*, 558 So. 2d at 426 n.6, summarily

rejected this ground without elaboration as one of eighteen grounds the court found

"were or should have been raised on direct appeal."

Correll correctly argues that, to prove the denial of counsel based on a conflict of

interest, he does not have to meet *Strickland*'s two-part deficient performance and

prejudicial outcome test.  Instead, Correll acquires a presumption of prejudice if he

meets the two-part test established in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which test

*Strickland* describes as follows:

> Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."

*Strickland*, 466 U.S. at 692, quoting *Sullivan*, 446 U.S. at 350.

Smith and Correll were defendants in unrelated criminal actions.  Correll's

attorney was not "actively representing conflicting interests" of a co-defendant, a

discouraged scenario rife with potential conflicts of interest.  *See, e.g., Holloway v.*

*Arkansas*, 435 U.S. 475 (1979), and *Glasser v. United States*, 315 U.S. 60 (1942).  Instead,

Smith and Correll were represented by attorneys who were, in essence, members of the

same law firm, that is, the Public Defender's Office.  To prove the denial of the right to

counsel, a defendant must show that an actual conflict of interest occurred, even if

co-defendants are represented by partners in the same law firm:

> There is certainly much substance to petitioner's argument that the appointment of two partners to represent coindictees in their respective trials creates a possible conflict of interest that could prejudice either or both clients.  Moreover, the risk of prejudice is increased when the two lawyers cooperate with one another in the planning and conduct of trial strategy, as [Burger's counsel] and his partner did.  Assuming without deciding that two law partners are considered as one attorney, it is settled that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of effective assistance of counsel."  *Holloway v. Arkansas,* 435 U.S. 475, 482, 98 S. Ct. 1173, 1178, 55 L. Ed. 2d 426 (1978).  We have never held that the possibility of prejudice that "inheres in almost every instance of multiple representation" justifies the adoption of an inflexible rule that would presume prejudice in all such cases.  See *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S. Ct. 1708, 1718, 64 L. Ed.

> 2d 333 (1980).  Instead, we presume prejudice "only if the defendant
> demonstrates that counsel 'actively represented conflicting interests'
> and that 'an actual conflict of interest adversely affected his lawyer's
> performance.'" *Strickland,* 466 U.S., at 692, 104 S. Ct., at 2067
> (citation omitted).

*Burger v. Kemp*, 483 U.S. 776, 783 (1987).  As a consequence, Correll must prove that an

actual conflict prejudiced his counsel's performance.  "We hold that the possibility of

conflict is insufficient to impugn a criminal conviction.  In order to demonstrate a

violation of his Sixth Amendment rights, a defendant must establish that an actual

conflict of interest adversely affected his lawyer's performance."  *Cuyler v. Sullivan*, 446

U.S. at 350.

Correll never complained in the state proceedings that an actual conflict

occurred.  In his federal petition Correll alleges that an actual conflict occurred because

defense counsel was deterred from developing a certain line of cross-examination of

Smith "because it would have opened the door to additional negative testimony" and

that the decision not to call Mr. Kinane as a witness was "not because of tactics or

strategy, but because of their friendship and professional relationship and because of the

conflict."  Third Amended Petition at 21.

Correll cites to a side-bar conference in which defense counsel stated his desire to

delve into why Smith was in protective custody.  At that point in the trial, the jurors

knew nothing about why Smith was in protective custody.  In the side-bar conference

the prosecutor (1) "caution[ed that] if [Correll] wants to go into that he can face the

consequences of other witnesses coming in and bolstering Mr. Smith's testimony"and

(2) argued that "unless [Correll]'s prepared to get some statements from someone in authority at the jail as to why he is where he is, then he's just really shooting in the dark." (Respondent's Exhibit XI at 1307)  The trial judge agreed.  Nothing in this exchange indicates that defense counsel felt compelled to alter his trial strategy because counsel would have had to call Mr. Kinane as a witness.

Correll's alleged proof of an actual conflict based on this side-bar exchange was never presented to the state courts, neither on direct appeal nor in the Rule 3.850 motion to vacate.  Defense counsel never alerted the trial judge that his not cross-examining Smith about protective custody was because counsel feared calling Mr. Kinane as a witness.  Correll's Rule 3.850 motion to vacate contains the same nebulous statement asserted in the federal petition—that "[t]rial counsel chose not to call Mr. Kinane, not because of tactics or strategy, but because of their friendship and professional relationship" (Respondent's Exhibit XXXVII at 107)—but the Rule 3.850 motion to vacate fails to cite the side-bar conference as support for this vague assertion. As a consequence, this assertion of a conflict of interest (based on the side-bar exchange) was an unsupported allegation in the state court proceedings.  By presenting to this court facts that were not presented to the state court, Correll fails to meet the exhaustion requirement because he has not "fairly presented" the "substance" of his claims to the state courts.  *See, e.g., Brown v. Estelle*, 701 F.2d 494, 495 (5th Cir. 1983) ("The exhaustion requirement is not satisfied if a petitioner presents new legal theories

or entirely new factual claims in support of the writ before the federal court."). The state courts understandably summarily rejected the unsupported allegation.

Finally, the alleged basis for an actual conflict of interest is not because his defense counsel labored under a divided loyalty with another client, but because of counsel's "friendship and professional relationship" with another attorney.  Defense counsel's decision not to call Mr. Kinane "because of their friendship and professional relationship" fails to show an actual conflict.  *See Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002) (criticizing expanding *Cuyler v. Sullivan* to permit no showing of actual prejudice in actions alleging a potential conflict of interest based on counsel's personal interests), citing *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980), *cert. denied*, 451 U.S. 938 (1981).  Because he fails to show both an actual conflict of interest and "that a conflict of interest actually affected the adequacy of his representation[, Correll must] demonstrate prejudice in order to obtain relief." *Sullivan*, 446 U.S. at 349-50.  Correll shows no prejudice and he never presented to the state courts what he asserts as prejudice.

Ground III
> Mr. Correll received ineffective assistance of a mental health
> expert . . . in violation of Sixth, Eighth, and Fourteenth
> Amendments to the United States Constitution.

In ground III Correll alleges that the defense's mental health expert failed to conduct a proper evaluation of Correll.  Ground III focuses on Correll's competency. Correll's mental health as mitigation evidence is addressed later in ground II, in which

Correll alleges that he was denied the effective assistance of counsel in the penalty phase.[22]

A. Facts:

The trial court granted defense counsel's request to appoint Dr. Pollack to conduct a psychiatric evaluation of Correll.  In an introductory letter (Exhibit 4, Third Amended Petition, Doc. 119) defense counsel alerted Dr. Pollack to several issues:

> Since this is not only an extremely serious case, but is also the kind of case in which Jerry's mental state could be a critical issue in his sentencing, even if he is not incompetent and was not insane, please take as much time as you feel necessary to examine him.  I do not believe that cost is a problem because of the seriousness of the case.  If you feel that any other testing ought to be done, let me know and I will try to get it done.
>
> I have waited some time to ask this of you in hopes of getting records from Jerry's school and background that might assist you.  Unfortunately, his school records indicate no problems with his emotions or behavior.
>
> Jerry used all kinds of drugs for several years.  He appears to me to have a somewhat flat affect due to his drug use.

In his report (Exhibit 5, Third Amended Petition, Doc. 119) Dr. Pollack (1) represents that Correll's cooperation facilitated conducting an adequate evaluation and (2) opines that Correll was both free "from any type of extreme emotional

---

[22]  To avoid both redundancy and confusion, Correll's allegation in ground III that trial counsel failed to adequately investigate Correll's background and as a consequence failed to adequately prepare the psychiatrist to conduct a mental health evaluation—to the extent that such a claim in asserted in ground III—is addressed later when reviewing Correll's allegation of ineffective assistance of counsel during the penalty phase, as alleged in ground II.

disturbance at the time of the alleged offense" and competent at the time of the offense

and at trial.  The following is the most relevant portion of the report:

> Mr. Correll was aware of the nature and purpose of my evaluation
> and was extremely cooperative throughout its entire course.
> Although, as he did with his counsel, he adamantly and vehemently
> denied having had anything to do with the alleged offense, he
> nevertheless provided me with all the information required to do an
> adequate Psychiatric Evaluation and to assess his state of mind, both
> at the present time as well as the time of the alleged offense.
>
> He claims he was raised in an intact family unit and that his
> relationship with his parents and siblings was fine . . . .  He states he
> has no previous arrest record, no past psychiatric history nor
> psychiatric treatment either as in- or out-patient.  He admits to using
> alcohol several times per week and has experimented with marijuana,
> cocaine and several other drugs, but not on any regular basis.  He
> claims he has no history of belligerent activity, either as a child or
> young adult, and no severe altercations with any individuals.
>
> Mr. Correll was married at age 25 [and divorced] two years [later]
> . . . .  He also stated he had been quite angry with [Susan] having been
> using and dealing in multiple drugs, especially amphetamine-like
> cogeners, and this was a source of constant friction between them.
> He stated that for six months the separation was easy, but after that,
> they began dating and she had even moved in with him.  Things went
> well for about one-half year, and the[n] he relates they both separated,
> but remained in touch.  They have a six-year old child, who was one
> of the victims, and he last saw them all reportedly one week before
> the events.
>
> The Mental Status Examination showed him today to be alert and
> oriented to person, place and time.  His mood is rather bland with a
> rather marked absence of depression or remorse.  His affect is also
> rather flat and constricted with some appropriate range, but, in
> general, somewhat detached.  M[r.] Correll claims that his general
> behavior and demeanor has been fairly consistent throughout his
> entire life and has suggested contact with other family members to
> confirm this.  Thought content showed a rather profound absence of
> guilt, absence of remorse and absence of grief over the death of his
> daughter and ex-spouse.  No evidence of any paranoia, delusions, or
> feelings of persecution.  Thought processes are grossly intact with no
> evidence of any cognitive dysfunction or hallucinatory activity.

Intellectual functions are grossly intact with no deficits in recent or remote memory — general fund of information is adequate.  His level of insight is fair, his judgement is fair.  There is no evidence of any suicidal or homicidal ideation.

At the present time, I feel that Mr. Correll appreciates the charges pending against him and the range and nature of possible penalties. He understands well the adversary nature of the legal process and has the capacity to disclose to his attorney pertinent facts surrounding the alleged offense.  He has the ability to relate to his attorney and assist him in planning his defense, and can realistically challenge prosecution witnesses.  Mr. Correll has the ability to manifest appropriate courtroom behavior and can testify relevantly, should he so choose.  He appears motivated to help himself in the legal process and is having no difficulty coping with the stress of incarceration prior to trial.

Accordingly, I feel that Mr. Correll is certainly competent to stand trial at the present time.

At the time of the alleged offense, I do not feel [that] he was laboring under any delusions, influence of exogenous substances or irresistable [sic] impulse which would render him incompetent or legally insane at the time of the alleged offense.

Further comment on Mr. Correll is that I do not feel that he suffers from any type of brain damage or impaired ability to appreciate the criminality of his conduct, nor do I feel that he was suffering from any type of extreme emotional disturbance at the time of the alleged offense.

. . . .

Addendum:  Should there be any statements or positions available from family or friends of Mr. Correll describing his behavior or change in behavior over the past several years, I would be more than happy to review these and evaluate whether or not this would imply any behavioral change or alter my present opinion.

In his state Rule 3.850 motion to vacate (Respondent's Exhibit XXXVII, Claim VIII at 147 *et. seq.*), Correll complained that Dr. Pollack failed to comply with defense counsel's request in the introductory letter that the doctor determine whether Correll

"suffer[s] from any brain damage . . . ."  The Rule 3.850 motion relies on test results

from three experts Correll hired after his conviction.  Each new expert disparages both

Dr. Pollack's evaluation and his opinions.  The post-conviction court rejected this

ground with the following analysis:

> Claim VIII, that the mental health expert appointed to evaluate
> Correll failed to conduct a professionally competent evaluation, is
> procedurally barred as it could have been raised on direct appeal.
> *Smith v. State*, No.75,208 (Fla. February 15, 1990);  *Doyle v. State*, 526
> So. 2d 909 (Fla. 1988).  Even if this claim was cognizable, it is
> without merit, as the record demonstrates that Dr. Pollack conducted
> a competent evaluation of Correll, based on what he was told by
> counsel after counsel's investigation and based on the statements of
> Correll himself.

*Correll II*, 558 So. 2d at 426, ignored the procedural default and rejected this

ground on the merits[23] with the following analysis:

> In the appeal from the denial of the motion for post-conviction relief,
> Correll makes two arguments that merit discussion.
>
> . . . .
>
> Correll's second argument is that he did not receive a professionally
> competent mental health evaluation.  He refers to reports of three
> mental health practitioners who have recently examined him and who
> find that he suffers from serious mental defects or brain damage as a
> result of his excessive use of drugs.
>
> The fact that Correll has now obtained psychiatric opinions which
> seriously question his mental capacity does not mean that he is
> entitled to a new penalty hearing.  Correll's attorney had specifically
> alerted Dr. Pollack to Correll's prior drug and alcohol use, and Dr.
> Pollack explored this area with Correll. Dr. Pollack explicitly
> concluded that Correll had no brain damage.

---

[23]  As a consequence, this aspect of ground III is not procedurally barred from a federal
review on the merits.

Correll's reliance upon *State v. Sireci*, 502 So. 2d 1221 (Fla. 1987), and *Mason v. State*, 489 So. 2d 734 (Fla. 1986), is misplaced.  In *Mason*, the defendant had been treated for mental retardation, had been held in a psychiatric ward, and had been the subject of a Baker Act petition for involuntary commitment.  In *Sireci*, the defendant had suffered organic brain damage as a result of an automobile accident which left him in a coma for two weeks and with right side facial paralysis.  *See State v. Sireci*, 536 So. 2d 231 (Fla. 1988).  There is no assertion that Correll had ever received prior mental health treatment.[4]  We reject Correll's claim that he did not receive an adequate mental health examination.

> [4]  The record reflects that his use of drugs did not prevent Correll from earning a living as a painter and a builder of fiberglass parts as well as from working at Walt Disney World.

B. Ineffective Assistance of Mental Health Expert:

Correll's first claim in ground III is that he was denied the effective assistance of a mental health expert.  *Ake v. Oklahoma*, 470 U.S. 68, 84 (1985), established an indigent's right to the assistance of a mental health expert:

> We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

In his federal petition Correll complains that Dr. Pollack "conducted a professionally inadequate evaluation."  As a consequence, Correll presents the same claim addressed in *Clisby v. Jones*, 960 F.2d 925, 929 (11th Cir. 1992), specifically that  "[h]aving been supplied with a psychiatric expert, petitioner does not allege a denial of psychiatric assistance, but a denial of competent psychiatric assistance."  Because his claim is that the psychiatric expert that the court appointed "conducted a professionally inadequate

evaluation," Correll necessarily alleges trial court error. *Clisby*, 960 F.2d at 930,

instructs using a two-step process to determine whether the trial court erred:

> [F]irst [we] examine the information before the trial court when it is
> alleged to have deprived the defendant of due process. . . . We then
> determine whether that information should have led the trial court to
> conclude that the defendant would probably not receive a fair trial.

The first step requires determining what information the trial court possessed when it

ruled. "As petitioner complains of the trial court's failure to provide him with

competent psychiatric assistance, rather than with psychiatric assistance of any form,

we need concern ourselves only with the facts that could have indicated to the trial

court that the psychiatrists who examined petitioner provided incompetent assistance."

960 F.2d at 930. Clisby's claim failed, 960 F.2d at 934, because the trial court was

never advised that the psychiatrist allegedly conducted an inadequate evaluation:

> [Clisby]'s claim of a due process violation collapses as soon as one
> seeks to identify the trial court's ruling that purportedly rendered
> [Clisby]'s trial fundamentally unfair. [Clisby]'s counsel only once
> alerted the trial court to what might be construed as Dr. Callahan's
> failure to provide competent assistance. After the first hearing on the
> first remand, [Clisby]'s counsel suggested to the trial court that he had
> been unable to obtain adequate psychiatric assistance for sentencing
> purposes because Dr. Callahan had examined [Clisby] only regarding
> competency to stand trial, and not regarding the existence of any
> mitigating circumstances. In response, the trial court ordered Dr.
> Callahan to examine [Clisby] with respect to mitigating
> circumstances. [Clisby]'s counsel never again complained of
> inadequate psychiatric assistance, even though he had plenty of
> opportunities to do so at the hearing immediately following Dr.
> Callahan's second examination on the first remand and at the hearing
> on the second, and final, remand. Even ignoring [Clisby]'s failure to
> identify a due process violation in any particular ruling by the trial
> court, the trial court's immediate response to the first and only
> suggestion of inadequate psychiatric assistance, the absence of any
> further such complaints, and the information available to the trial

> court until the day it entered the final findings and conclusions compel the conclusion that [Clisby] was not denied a fair trial.
>
> Unable to pinpoint the ruling in which the trial court denied him due process by violating his right to competent psychiatric assistance, [Clisby] is left with a naked complaint about the purported incompetence of Dr. Callahan's assistance. Stripped of its due process pretensions, [Clisby]'s claim therefore amounts to an allegation of expert incompetence akin to an ineffectiveness of counsel claim under the Sixth Amendment. *Ake,* however, exclusively relied on due process grounds and explicitly refused to consider the applicability of the Sixth Amendment. *Ake,* 470 U.S. at 87 n. 13, 105 S. Ct. at 1098 n. 13.

Correll is in the same position as Clisby. Correll never alleges, and the record does not show, that the trial court was informed that Dr. Pollack allegedly "conducted a professionally inadequate evaluation." As a consequence, *Clisby* forecloses Correll's claim that the trial court denied him the effective assistance of a mental health expert. *See Blanco v. Sec'y, Dep't of Corr.*, 688 F.3d 1211, 1228 (11th Cir. 2012) ("As we instructed in *Clisby*, 960 F. 2d at 928– 29, 934, and later in *Provenzano v. Singletary*, 148 F.3d 1327, 1333–34 (11th Cir.1998), the defendant must point to an error of the trial court that deprived him of due process of law to make out an *Ake* claim. In this case, however, Blanco fails to expressly tell us when or how the trial judge denied him due process during re-sentencing.").

Ground XV

Mr. Correll was denied a fair trial and sentencing due to presentation of false or misleading evidence.[24]

---

[24] Earlier in this order Correll's claim of ineffective assistance of counsel—that trial counsel rendered ineffective assistance by not properly investigating the educational background of the expert witness—was found unexhausted and procedurally barred from federal review.

The prosecution presented the testimony of Judith Bunker, an employee of the Orange County Medical Examiner's Office.  The trial court accepted Ms. Bunker as an expert witness for blood spatter analysis.  Correll alleges that Ms. Bunker misrepresented both her educational background (the lack of a high school diploma) and her actual job assignments while employed in the medical examiner's office.  *Correll III*, 698 So. 2d at 523-24 (italics original), agreed with the post-conviction court that Correll's new evidence fails to qualify as "newly discovered evidence" because the evidence was discoverable at the time of trial and because the alleged misrepresentations had no impact on the outcome of the action:

> In order for evidence to qualify as newly discovered, "the asserted facts 'must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that the defendant or his counsel could not have known them by the use of due diligence.'" *Jones v. State*, 591 So. 2d 911, 916 (Fla. 1991) (quoting *Hallman v. State*, 371 So. 2d 482, 485 (Fla. 1979).  To obtain relief based on a newly discovered evidence claim, the defendant must establish that "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." *Jones*, 591 So. 2d at 915.

> In its order denying Correll's motion for post-conviction relief the trial court stated:

>> The gravamen of the allegations contained in Correll's motion is that Ms. Bunker has, subsequent to her testimony in the instant case, exaggerated her credentials, most notably holding herself out to be a high school graduate when she apparently does not, in fact possess a high school diploma.  Significantly, the thrust of Correll's complaint appears to be the witness's qualification as an expert, as opposed to the substance, i.e. scientific validity or accuracy, of her testimony.

>> All of the "newly discovered evidence" contained in the Defendant's motion is purely collateral to Ms. Bunker's

qualification as an expert witness by this Court. Ms.
Bunker's qualification as an expert at trial was based
almost entirely on her experience in the relatively new
field of blood spatter analysis, and not on her education.
Clearly, whatever education the witness did or did not
possess was discoverable at the time, had the appropriate
questions been asked. Because no *reasonable* probability
exists that the "newly discovered evidence" presented in
the Defendant's post-conviction motion would have
affected the outcome of the trial, had it been known at the
time, no evidentiary hearing was warranted. *See Jones v.
State*, 591 So. 2d 911 (Fla. 1991).

We agree with the trial court that the evidence proffered by Correll
does not qualify as newly discovered evidence because it was
discoverable at the time of trial. However, even if the evidence was
not discoverable at the time of trial, the discrepancies between the
level of education, training, and experience Bunker testified to at trial
and the asserted level of education, training, and experience she
actually had were not so great as to make any difference in the
outcome of the case. Moreover, Bunker's vita, which among other
things, falsely set forth that Bunker had a high school diploma, was
never seen by the jury. Thus, any misrepresentations contained in the
vita are irrelevant to Correll's claim.

The only alleged misrepresentation of any import was Bunker's
assertion that she had worked as an assistant and technical specialist
for the medical examiner's office from 1970 through 1982, when in
reality she was a secretary at the medical examiner's office from 1970
to 1974, an assistant to the medical examiner from 1974 to 1981, and
a technical specialist for the last five months of her employment with
the medical examiner's office. In view of the fact that it is undisputed
that she worked on thousands of cases while in the employ of the
medical examiner, even this discrepancy becomes less serious.

However, assuming for the sake of argument that Bunker's testimony
did contain serious discrepancies that could not have been discovered
during trial, we are convinced that these discrepancies did not have
any impact on the outcome of the case in light of the overwhelming
evidence presented at trial in support of Correll's guilt.[1] Moreover,
Bunker's testimony was not crucial to the State's case and merely
corroborated the medical examiner's testimony. Correll's argument
that Bunker's testimony greatly affected the outcome of the case
because it was the only evidence presented in support of the State's

"single-killer" theory is meritless because there was overwhelming evidence of Correll's guilt regardless of whether other perpetrators were involved in the murders.[2]

> [1] Correll had previously threatened to kill his ex-wife. In addition, several bloody fingerprints and palm prints found at the crime scene were matched to Correll's. Correll also had scratches, cuts, and bruises on his hands and forearms when he was questioned by the sheriff's department on the night of the murder.

> [2] Bunker never expressed an opinion with respect to how many persons committed the crimes.

*Correll III* above quotes the post-conviction court's written order. The post-conviction judge also orally denied the motion for post-conviction relief (Respondent's Exhibit XXXIX at 22-24), stating that he would have qualified Ms. Bunker as an expert witness even if the witness's true educational background and actual position within the medical examiner's office were known.

> Her qualification as an expert in this case was based almost entirely — and that's clear from the record as well — on her experience in the relatively new field of blood spatter analysis, not on whether she had a high school diploma or any other degree. And I don't see anything here that indicates that she was not sufficiently qualified by virtue of her experience to have given the expert testimony that she did give.

> It's true I believe that both the jury and the court found the testimony to be credible and relied upon it but that is because she was—in a believable and effective way through blood spatter analysis—able to demonstrate to the jury and to the court exactly how Jerry Correll went about killing these four people.

> So the fact that she may have exaggerated her credentials in a c[urriculum] v[itae] that was not reviewed by the jury was not the subject of her qualification is purely collateral.

> I note that the testimony itself that she gave is apparently not being attacked as to its scientific validity or accuracy, only whether or not she was properly received as an expert. With the same background

and experience as I now know her to have, she would have been
admitted as an expert in the emerging field of blood spatter analysis in
1986.

I think obviously whatever education she did have or didn't have was
discoverable at the time, had the questions been asked.  And I don't
think it would have had a bearing on her qualification as an expert in
this new field at any rate.

If that is the subject matter of the pending public records request,
simply to indicate where she did or did not previously testify, there's
ample indication that she had previously qualified and would have
qualified in this case as an expert in blood spatter analysis.  Therefore,
I don't see a necessity for an evidentiary hearing.

The witness was a qualified expert based upon her training and
experience, not based upon her educational background.  Motion is
denied.

The record supports rejecting Correll's newly discovered evidence argument.  On

*voir dire*, defense counsel verified that Ms. Bunker was not a medical doctor and that she

held no degree in either chemistry or biology.  Ms. Bunker was not asked whether she

attained a high school diploma.  In overruling defense counsel's objection to qualifying

Ms. Bunker as a expert witness "in bloodstain pattern analysis and crime scene

reconstruction," the trial court stated that "I don't think that the only way of obtaining

expertise is through receiving a degree.  I will permit this witness to give opinion

testimony concerning bloodstain analysis."  (Respondent's Exhibit XII at 1470 and

1474)

The trial court followed Florida law by relying on experience instead of

education.  *Cheshire v. State*, 568 So. 2d 908, 913 (Fla. 1990), upheld a trial court's

qualifying a witness as an expert with similar or less experience than Ms. Bunker.

> Cheshire alleges that the trial court improperly qualified a man named Allen Miller as an expert in blood-spatter evidence.  It appears Miller's qualifications consisted of a single forty-hour course, three prior qualifications as an expert and his own field experience.  While we agree that these qualifications are open to reasonable question, we nevertheless believe that the trial court did not abuse its discretion in allowing this expert testimony.  Any deficiencies in an expert's qualifications, experience and testimony may be aired on cross-examination, provided there is some reasonable basis to qualify the expert.  We believe such a basis existed on this record.

*Accord Anderson v. State*, 863 So. 2d 169, 180 (Fla. 2003) (holding that the trial court did not abuse its discretion in qualifying an expert witness who had credentials similar to the expert witness in *Cheshire*), *cert. denied*, 541 U.S. 940 (2004).

The trial court's qualifying Ms. Bunker as an expert witness based on her experience, as compared to her educational background, is consistent with federal practice.  *United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) ("While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status.  In fact, the plain language of Rule 702 makes this clear:  expert status may be based on 'knowledge, skill, *experience*, training, or education.'") (*en banc*) (italics original), *cert. denied*, 544 U.S. 1063 (2005).  As a consequence, Correll fails to show that his discovery of Ms. Bunker's alleged misrepresentations qualifies as "newly discovered evidence."  The trial court stated that the alleged misrepresentations had no effect on the trial because the court would have qualified her as an expert witness even if the witness's true educational background and actual position within the medical examiner's office were known. Correll is entitled to no relief based on ground XV.

# VII.  PENALTY PHASE

<u>Ground XIV</u>
The avoid arrest aggravating circumstance was improperly
applied, in violation of the Eighth and Fourteenth Amendments.

Correll contends that the "trial court improperly found the avoiding arrest

aggravating circumstance as to the murders of" Tuesday and Ms. Jones because the

state failed to "prove this aggravator beyond a reasonable doubt."  The respondent

correctly argues that Correll presented the underlying basis for this claim on direct

appeal but only as a sufficiency-of-the-evidence claim under state law.  Nevertheless,

exhaustion is complete because the state standard of review for a sufficiency-of-the-

evidence claim is identical to the federal standard of review.

> Florida courts assess the sufficiency of the evidence used to convict
> criminal defendants under a legal standard identical to the one used
> by federal courts in deciding federal due process challenges to the
> sufficiency of the evidence.
>
> In this case, the state court analyzed [petitioner]'s due process
> sufficiency of the evidence claim using a standard identical to the one
> required under federal law.  Under these circumstances, we conclude
> [petitioner]'s federal claim has been exhausted.

*Mulnix v. Sec'y, Dep't of Corr.,* 254 Fed. App'x 763, 764-65 (11th Cir. 2007).  As a

consequence, Correll "fairly presented" ground XIV to the state courts.

*Correll I*, 523 So. 2d at 567-68, rejected the sufficiency-of-the-evidence claim with

the following analysis:

> Correll next alleges that the trial court improperly found certain
> aggravating factors as a basis for the judgment of death.  Correll first
> challenges the court's finding that the murders of Tuesday and [Ms.]
> Jones were committed for the purpose of avoiding arrest.  In order to

support this finding where the victim is not a law enforcement officer, the state must prove beyond a reasonable doubt that the dominant motive for the murder was the elimination of a witness. *Doyle v. State*, 460 So. 2d 353 (Fla.1984); *Menendez v. State*, 368 So. 2d 1278 (Fla. 1979); *Riley v. State*, 366 So. 2d 19 (Fla. 1978), *cert. denied*, 459 U.S. 981, 103 S. Ct. 317, 74 L. Ed. 2d 294 (1982).  We conclude that the evidence in this case supports the finding of this aggravating circumstance.  With respect to [Ms. Jones], the facts indicate that she was the last person killed that night as she returned from seeing her boyfriend.  It is evident that Correll intended to leave no survivors in the house.  All of the telephone lines were cut, and the knife which severed one of the lines was already bloody.  Correll was well acquainted with [Ms.] Jones and she could have easily identified him.  It is also likely that Correll's daughter . . . was a witness to the murders.  Since the relationship between Tuesday and her father appeared cordial, it is difficult to see why she was killed except to eliminate her as a witness.  *See Hooper v. State*, 476 So. 2d 1253 (Fla. 1985), *cert. denied*, 475 U.S. 1098, 106 S. Ct. 1501, 89 L. Ed. 2d 901 (1986).

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *In re Winship*, 397 U.S. 358, 364 (1970).  Because the burden of proof for both the elements of a criminal offense and an aggravating circumstance are the same, review for the sufficiency-of-the-evidence is the same. *See Bullington v. Missouri*, 451 U.S. 430, 438 (1981) (The prosecution in the penalty phase "undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts.  The pre-sentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence.  It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes.").

*Jackson v. Virginia*, 443 U.S. 307, 324 (1979), establishes the standard of review

for a sufficiency-of-the-evidence challenge in a Section 2254 petition.

> We hold that in a challenge to a state criminal conviction brought
> under 28 U.S.C. § 2254—if the settled procedural prerequisites for
> the claim have otherwise been satisfied—the applicant is entitled to
> habeas corpus relief if it is found that upon the record evidence
> adduced at the trial no rational trier of fact could have found proof of
> guilt beyond a reasonable doubt.

The governing question is whether a rational trier of fact could have found proof

beyond a reasonable doubt, not whether the federal habeas court believes the evidence.

*Jackson v. Virginia*, 443 U.S. at 318-19 ("[T]his inquiry does not require a court to 'ask

itself whether *it* believes that the evidence at trial established guilt beyond a reasonable

doubt.'"  (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966) (emphasis original)).

A federal court, reviewing a state conviction in a Section 2254 petition, must

defer to a jury's credibility determination in weighing conflicting evidence:

> The federal courts have consistently reiterated that this standard for
> weighing the constitutional sufficiency of the evidence is a limited
> one.  It is not required that the evidence rule out every hypothesis
> except that of guilt beyond a reasonable doubt.  Faced with a record
> of historical facts that supports conflicting inferences, we must
> presume that the jury resolved such conflicts in favor of the
> prosecution, deferring to the credibility of the evidence.  The simple
> fact that the evidence gives some support to the defendant's theory of
> innocence does not warrant the grant of habeas relief.

*Wilcox v. Ford*, 813 F.2d 1140, 1143 (11th Cir.) (footnote and citations omitted), *cert.*

*denied*, 484 U.S. 925 (1987).  *Accord Johnson v. Alabama*, 256 F.3d 1156, 1172 (11th Cir.

2001) ("Although each element of the offense must be established beyond a reasonable

doubt, . . . the State is not required to rule out every hypothesis except that of the guilt

of the defendant.") (citations omitted), *cert. denied sub nom, Johnson v. Nagle*, 535 U.S.
926 (2002).

The facts recited in *Correll I*, 523 So. 2d at 568, warrant repeating:

> With respect to [Ms.] Jones, the facts indicate that she was the last
> person killed that night as she returned from seeing her boyfriend.[25]
> It is evident that Correll intended to leave no survivors in the house.
> All of the telephone lines were cut, and the knife which severed one of
> the lines was already bloody.  Correll was well acquainted with [Ms.]
> Jones and she could have easily identified him.  It is also likely that
> Correll's daughter . . . was a witness to the murders.  Since the
> relationship between Tuesday and her father appeared cordial, it is
> difficult to see why she was killed except to eliminate her as a witness.

Correll eliminated the possibility of an emergency call to the police by severing
the telephone lines.  Based on the facts in the record, silencing those who could identify
Correll is the only plausible explanation that justifies Correll's murdering his daughter
and Ms. Jones.  The record supports the conclusion that Correll chose to murder each
of them because each could identify Correll.  Based on this evidence, a rational trier of
fact could have found proof beyond a reasonable doubt that Tuesday and Ms. Jones
were murdered to avoid arrest.

<u>Ground VII</u>
The trial judge failed to find mitigating factors apparent on the
record in violation of the Eighth and Fourteenth Amendments.

Correll contends that, despite his presenting mitigation evidence, the trial court
erred in failing to find specific mitigating circumstances.  Although he cites fifteen

---

[25] The trial transcript establishes that Ms. Jones spent the evening with her boyfriend and
departed around midnight to return to her home.  (Respondent's Exhibit V at 572)

individual pages he contends contain mitigation testimony, Correll fails to identify

mitigation evidence on any specific page.  Instead, immediately following the list of

page numbers Correll states that "[f]actors such as poverty, emotional deprivation, lack

of parental care, hard worker, poor family relationships, and drug abuse history are

mitigating under Florida law."  Although a correct statement, Correll fails to show that

sufficient evidence was presented during the penalty hearing to warrant finding one of

the non-statutory mitigating circumstances that he lists.  Correll fails to connect his list

of non-statutory mitigation evidence to the facts presented in his trial.

The penalty hearing transcript shows that defense counsel's obvious strategy was

to "humanize" Correll by showing that he was a good person who deserved life

imprisonment and not death.  Correll's mother testified that in his youth Correll was

"happy go lucky, loved to fish, [and to] swim" (Respondent's Exhibit XVII at 1893), a

description that Correll confirmed when he testified that he had a normal childhood.

(*Id.* at 1934)  Both Correll and his mother testified that he had a good relationship with

his father.  (*Id.* at 1894, 1936, and 1939)  Both Correll's mother and his brother testified

that Correll never exhibited violence.  (*Id.* at 1894 and 1896)  Correll, his mother, his

brother, and his brother's wife testified that Correll was good to his daughter (Tuesday)

and took her to beaches, parks, picnics, and "cook-outs."  (*Id.* at 1895, 1897, 1899, and

1948)  After his divorce Correll moved into his mother's home and helped her around

the house.  (*Id.* at 1950)  Both Correll and his brother's wife testified that after Correll's

arrest for the murders he started re-connecting with his religious roots.  (*Id.*  at 1903-04

and 1941-42)  Finally, Correll presented a sociologist who testified that Correll's lack of

a criminal record and his familiarity with the victims imply that Correll has little chance

of committing another, similar offense.  (*Id.* at 1927-28)

During the penalty hearing Correll admitted to consuming alcohol and smoking

marijuana since he was seventeen or eighteen years old and to using "crystal meth,

cocaine, various other drugs . . . on and off . . . [but] not on a regular basis."  (*Id.* at

1939-40)  He also testified (1) that he and Susan divorced because she suspected that he

was having an affair when he was working long hours and (2) that she started "drinking

pretty heavy" and "I was doing cocaine."  (*Id.* at 1947)  After the divorce they "lived

apart" and "moved back in together quite a few different times."  (*Id.* at 1948)

As the written sentencing order states (Respondent's Exhibit XXIX at 4097), the

trial judge found this evidence insufficient to support either a statutory or a

non-statutory mitigating circumstance:

> The Court has carefully considered all statutory mitigating factors and
> finds that no mitigating circumstance exists in the evidence of this
> case.  The Court has also carefully examined and considered the
> record for any other factor or circumstance involving the case and the
> character of Jerry Correll.  No mitigating circumstances can be found.

Correll presented this claim—that the trial court failed to find mitigating factors

that were evidenced on the record—on direct appeal as trial court error.  *Correll I*, 523

So. 2d at 568, summarily rejected the claim and stated, "We also find no error with

respect to . . . the lack of mitigating factors."  Also Correll presented this claim in his

state petition for extraordinary relief as a claim of ineffective assistance of appellate

counsel. *Correll II*, 558 So. 2d at 424-25, rejected this claim stating:

> Correll further argues that appellate counsel was ineffective for failing
> to contend that the trial court erred in not finding mitigating
> circumstances. However, appellate counsel did make this argument
> in this Court, and we specifically found no error with respect to the
> lack of mitigating factors. *Correll*, 523 So. 2d at 568.

Correll correctly argues that a trial judge cannot refuse to consider non-statutory

mitigating evidence. "Just as the State may not by statute preclude the sentencer from

considering any mitigating factor, neither may the sentencer refuse to consider, as a

matter of law, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104,

113-14 (1982). Correll's trial judge did not refuse to consider non-statutory mitigation

evidence. Before pronouncing sentence the trial judge stated that the testimony

presented in mitigation was insufficient to find a mitigating circumstance. "I have

carefully considered all of the mitigating statutory factors and have found that none of

those exist. I have considered what your counsel has advanced concerning your

personal character and find there to be no mitigating factor whatsoever."

(Respondent's Exhibit XVII at 2027) The trial judge, ensuring that the jurors

considered all of the evidence Correll presented, charged the jury that "the mitigating

circumstances you may consider" include "any aspect of the defendant's character or

record and any other circumstance of the offense." (Respondent's Exhibit XVII at

2003-04) The trial judge's finding of no mitigation is presumed correct. *Atkins v.

Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) ("Trial court's findings on mitigating

factors are presumed to be correct, *see, e.g., Magwood v. Smith,* 791 F.2d 1438, 1450 (11th Cir. 1986), and will be upheld if they are supported by the record."), *cert. denied*, 515 U.S. 1165 (1995).

The written sentencing order (Respondent's Exhibit XXIX at 4095-98) omits specifically addressing each potential non-statutory mitigating factor, but *Parker v. Dugger*, 498 U.S. 308, 317-18 (1991) (emphasis original), explains that the omission was the common practice when Correll was sentenced in 1986.

> By statute, the sentencing judge is required to set forth explicitly his findings as to only the statutory aggravating and mitigating circumstances.  Fla. Stat. § 921.141(3) (1985).  Florida case law at the time the trial judge entered Parker's sentencing order required no more.  *See Mason v. State,* 438 So. 2d 374, 380 (Fla. 1983) (trial judge need not expressly address each nonstatutory mitigating circumstance), *cert. denied*, 465 U.S. 1051, 104 S. Ct. 1330, 79 L. Ed. 2d 725 (1984).  Only very recently has the Florida Supreme Court established a requirement that a trial court must expressly evaluate in its sentencing order each nonstatutory mitigating circumstance proposed by the defendant.  *See Campbell v. State,* 571 So. 2d 415 (1990).  The absence of a requirement that the sentencing order contain specific findings as to nonstatutory mitigating circumstances probably explains why the order here discusses only those circumstances categorized by statute.  Nonstatutory evidence, precisely because it does not fall into any predefined category, is considerably more difficult to organize into a coherent discussion; even though a more complete explanation is obviously helpful to a reviewing court, from the trial judge's perspective it is simpler merely to conclude, in those cases where it is true, that such evidence taken together does not outweigh the aggravating circumstances.  And so the judge did, stating that he found "no mitigating circumstances *that outweigh the aggravating circumstances.*"

The record shows that the trial judge neither precluded Correll from presenting non-statutory mitigation evidence nor refused to consider the non-statutory mitigation

evidence that was presented.  As *Atkins*, 965 F.2d at 962 (emphasis original), explains,

the trial judge committed no error:

> Although Atkins argues that the trial judge did not *consider*
> nonstatutory factors, it is more correct to say that the trial judge did
> not *accept*—that is, give much weight to—Atkins' nonstatutory
> factors.  Acceptance of nonstatutory mitigating factors is not
> constitutionally required; the Constitution only requires that the
> sentencer *consider* the factors.  *Blystone v. Pennsylvania,* 494 U.S. 299,
> 308, 110 S. Ct. 1078, 1084, 108 L. Ed. 2d 255 (1990).  Our review of
> the record and of the trial judge's order convinces us that the trial
> judge fully considered all the supposedly mitigating factors offered by
> Atkins but, in the light of the other evidence presented by the state,
> refused to accept most of those factors.

Florida law was consistent with *Atkins* when Correll was tried in 1986.  *See, e.g.,*

*Lemon v. State*, 456 So. 2d 885, 887 (Fla. 1984) ("Although the consideration of all

mitigating circumstances is required, the decision of whether a particular mitigating

circumstance is proven and the weight to be given it rests with the judge and jury.")

(rejecting as mitigating circumstances both the defendant's age and the defendant's

argument that the murder was a crime of passion), *cert. denied*, 469 U.S. 1230 (1985);

*Daugherty v. State*, 419 So. 2d 1067, 1071 (Fla. 1982) ("[I]t is within the province of the

trial court to decide whether a particular mitigating circumstance in sentencing has been

proven and the weight to be given it.") (rejecting as mitigating circumstances both the

defendant's age – twenty years old – and the defendant's conversion to Christianity),

*cert. denied*, 459 U.S. 1228 (1983).  *See also Quince v. State*, 414 So. 2d 185, 187 (Fla.)

("[T]his is a case in which the appellant disagrees with the weight that the trial judge

accorded the mitigating factor.  But mere disagreement with the force to be given such

evidence is an insufficient basis for challenging a sentence."), *cert. denied*, 459 U.S. 895

(1982).

Correll fails to show that the trial court erred by rejecting the mitigation evidence

as proof of a non-statutory mitigating circumstance.  Ground VII lacks merit.

Ground V (B)
Trial counsel was rendered ineffective by court rulings in violation
of the Sixth, Eighth, and Fourteenth Amendments [in the] Penalty
Phase.

This ground is based on the trial court's denial of Correll's request for a

continuance before commencing the penalty phase.  Correll identified this issue as

"Point XIX" in his initial brief on direct appeal.  (Respondent's Exhibit XXXV)

The Public Defender's Office was appointed to represent Correll in July, 1985,

when he was arrested. Defense counsel had nearly seven months to prepare for trial.

Defense counsel requested no continuance.  The trial started the last week of January,

1986.  On Thursday, February 6, 1986, during the second week of trial, the morning

commenced with jury instructions and the jurors started their deliberation.

Immediately after the jury left the courtroom defense counsel requested a delay of a day

before commencing the penalty phase, if one was necessary.  (Respondent's Exhibit

XVI at 1850)  The trial judge stated (*Id.* at 1850-51):

> I'm going to give you that day, and today is that day.  I will not be
> starting the penalty phase until tomorrow morning, should it be
> needed.  I think you go ahead and plan on the penalty phase, as I told
> you earlier.  Bring your witnesses, type your motions, prepare your
> jury instructions as if you're sure we're going forward with the penalty
> phase.  If in fact it's not needed, that effort will be wasted.  But, on the
> other hand, if it is needed, we'll be ready tomorrow.

The jury returned with their guilty verdict late in the afternoon.  As a consequence, defense counsel had nearly all of that day (from 9:37 a.m. until 5:37 p.m. on Thursday) to prepare for the penalty phase, which commenced the following morning (Friday) without an objection from the defense about insufficient time to prepare.  (Respondent's Exhibit XVII at 1861)  The witness testimony in the penalty phase concluded at the end of the morning.  Just before leaving for the lunch break, defense counsel complained that "overnight" was insufficient time to prepare Correll for the penalty phase.  The trial judge responded that "I don't think it's inappropriate that I did go forward." (*Id.* at 1977)

On direct appeal Correll argued that the trial court abused its discretion in not granting a continuance before commencing the penalty hearing.  (Respondent's Exhibit XXXV at 132, "Point XIX")  In his opening brief Correll recognized that granting a continuance rests within the trial court's discretion, even in a death penalty action.  (*Id.* at 133)  *Correll I*, 523 So. 2d at 564 n.*, summarily rejected this ground without elaboration as one of ten grounds the court found "to be without merit . . . ."[26]

Correll challenges the trial court's "requiring counsel to proceed directly into the penalty phase despite repeated requests for a continuance to prepare and to transport witnesses from Orlando to Sarasota" and alleges that "during the penalty phase itself, counsel alerted the court to problems due to the court's insistence that the penalty phase

---

[26] Additionally, *Correll II*, 558 So. 2d at 426 n.6, summarily rejected this ground without elaboration as one of eighteen grounds the court found "were or should have been raised on direct appeal."

begin immediately, but the court refused to contemplate counsel's concerns." (Third Amended Petition at 41, Doc. 119)  Although Correll states aggressively that defense counsel made "repeated requests for a continuance," defense counsel made only two requests, the first before the jury began deliberation in the guilt phase and the second <u>after</u> the testimony concluded in the penalty phase.  In addition to his testimony, Correll presented the testimony of his mother, his brother, his brother's wife (each of whom was from Orlando), and his expert witness (who was from Gainesville).  Correll identifies no witness or subject that he was precluded from presenting and specifies no prejudice because the trial court declined to continue the penalty phase.

## VIII.  INEFFECTIVE ASSISTANCE OF COUNSEL: GUILT PHASE

Correll claims ineffective assistance of counsel, a difficult claim to sustain. "[T]he cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented.  In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims.  According to *Strickland*, first, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance

> prejudiced the defense.  This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.  *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Correll must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691-92.  To meet this burden, Correll must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  466 U.S. at 690-91.  Correll cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . .  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).  *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable . . . .  [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).  *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

In denying Correll's motion for post-conviction relief, both the post-conviction court and the supreme court specifically recognized that *Strickland* governs a claim of

ineffective assistance of counsel.  (Respondent's Exhibit XXXVII at 3 and *Correll II*, 558 So. 2d at 426, respectively)  Although this pre-AEDPA action is entitled to *de novo* review without deference to the state court's decision, defense counsel's decisions are entitled to deference.  "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one."  *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 788 (2011).

Ground IV

> Mr. Correll was denied effective assistance of counsel at the guilt/innocence phase of his trial, in violation of the Sixth, Fifth and Fourteenth Amendments to the United States Constitution.

In this ground Correll asserts six claims of ineffective assistance of trial counsel. *Correll II*, 558 So. 2d at 426 n.5, summarily rejected the six claims in this ground without elaboration other than to identify the ground as without merit.

A.  Witness Charles Wood:

Charles Wood was the last defense witness to testify at the guilt phase.  His testimony was an effort to cast suspicion onto Rick Henestofel.[27]  (Respondent's Exhibit XV at 1732-38)  Correll faults trial counsel for not having Wood testify that Wood was present at Susan's home the week before the murders and saw the locks changed because Susan had lost her key.  The post-conviction court rejected this claim as follows (Respondent's Exhibit XXXVII at 3):

---

[27]  Henestofel's tires were slashed outside the ABC Lounge on the night of the murders. Henestofel testified for the prosecution that five days before the murders Correll stated that Susan could not hide because he (Correll) still had a key to the house.  See earlier discussion at footnote 10.

Correll contends that counsel was ineffective because he had information that the locks on Mrs. Hines's house had been changed and did not use it to refute the state's inference that Correll used keys that he had to obtain entry; such evidence could have demonstrated that forced entry was required or shown that entry was consensual and thus at odds with the state's theory that Susan was afraid of Correll. Even if counsel possessed such information, the failure to utilize it does not undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668 (1984). There was no evidence that entry was forced, so such evidence would not have supported such a theory, and the possibility of Correll obtaining consensual entry is not at odds with any theory, as the evidence showed he was a frequent visitor at the house and had in fact lived there until shortly before the murders occurred. Whether or not Correll had keys was not an outcome determinative issue in this case.

According to the notes from the public defender's investigator, trial counsel was aware that Wood knew about the changing of the locks. (Third Amended Petition, Exhibit 10, Doc. 119) This information was corroborated in Henestofel's deposition.[28] (Respondent's Exhibit XXII at 2810) Trial counsel's not asking Wood about changing the locks was neither deficient performance nor prejudicial. The state court correctly determined that "there was no evidence that entry was forced." As a consequence, entry was gained either by consent or by using a key to the home. Correll was able to routinely gain access to the home by either means. Correll had recently resided at the residence, his daughter lived there, and nothing indicates that Correll would have been denied entry. Not disclosing to the jury that the locks were recently changed is

---

[28] Mr. Henestofel's deposition also reveals that the lock might not have been changed in the "Florida room," which is the room in which Correll stayed when he lived in the house and the room for which Correll allegedly still possessed a key.

inconsequential.  Correll fails to show that counsel's not asking Wood about the locks was ineffective assistance of counsel.

B.  Day of the Murders:

Correll was arrested on July 2, 1985, the day after the murders.  (Respondent's Exhibit XXVIII at 3767)  The following August, trial counsel filed a "Motion for Statement of Particulars," specifically to "indicate the exact time, date and location within Orange County that the alleged offense occurred, as particularly as is known to the State."  (*Id.* at 3800)  In September the indictment was returned charging Correll with the four murders and identifying June 30th as the day of the murders.  (*Id.* at 3820)

In his second claim under ground IV Correll faults trial counsel's not setting the "statement of particulars" for a hearing.  The post-conviction court rejected this claim as follows (Respondent's Exhibit XXXVII at 3):

> Correll next alleged that if counsel had noticed his motion for statement of particulars and obtained a bill in response that the murders were committed on June 30th Florida law would have required the state's proof to conform to that date.  The record demonstrates that the motion was filed prior to the return of the indictment and before discovery was conducted, and counsel was not ineffective for failing to set for hearing a moot motion to obtain information he already had.  Prejudice cannot be affirmatively demonstrated and is speculative at best, as there is no indication that such motion would have been granted, and if so, that the statement would have contained the date alleged by Correll.

Correll relies on the following erroneous interpretation of the facts: "It is clear that counsel filed a motion for a bill of particulars because the indictment alleged that the homicide occurred on June 30, 1985 . . . ."  The motion for a statement of

particulars was filed on August 13th, approximately four weeks before the indictment was returned.  As the state court correctly recognized, under state law the motion became moot when the indictment was returned.  Correll fails to show that trial counsel rendered ineffective assistance by not setting for hearing a moot motion.

Additionally, Correll likely would not have prevailed at a hearing on the moot motion.  The indictment charged the offense as having occurred on June 30th.  The proof at trial showed that the crime likely occurred between midnight and 1:00 a.m. on July 1st.  Although Correll alleges that he had an alibi until shortly after midnight, under controlling Florida law the actual time of the offense is generally inconsequential.  "We hold that time is not a substantive part of a charging document and that our present discovery rules eliminate the need for the specificity required by prior case law." *Tingley v. State*, 549 So. 2d 649, 649 (Fla. 1989).  In his Third Amended Petition Correll relies on "prior case law," that is, actions decided before *Tingley*.

C.  Chain of Custody:

Correll alleges that trial counsel rendered ineffective assistance by not establishing "a chain of custody for the introduction of exculpatory physical evidence," specifically regarding Correll's hair.  Correll attempted to present the testimony of a hair expert, but the trial court sustained the prosecution's objection based on an incomplete chain of custody.  According to the state's evidence, no hair was collected from the crime scene that matched Correll's hair, a fact that Correll contends is significant:

The absence of Mr. Correll's hair from both the house and on the victims themselves is significant.  First, Mr. Correll had shoulder length hair at the time, and would have provided an abundant source of hair evidence had he merely been in the house and ran his fingers through his hair.  Secondly, the State's blood spatter expert Judith Bunker testified that the blood in the house was consistent with a mortal struggle between the assailant(s) and the three adult victims and the State asserted that Mr. Correll had sex with Susan Correll on her bed post-mortem.

The post-conviction court rejected this claim—that counsel was ineffective for not establishing a chain of custody—as follows (Respondent's Exhibit XXXVII at 4):

Correll next alleged that counsel was ineffective for failing to establish a chain of custody for the lack of evidence of his hair at the crime scene.  Correll cannot demonstrate prejudice, since this claim involves a lack of evidence, which counsel was able to thoroughly argue before the jury, so he would have been in no better position had a chain of custody been established.

Correll cannot show prejudice even if he could show deficient performance.  One of trial counsel's last arguments during closing statements addressed the lack of Correll's hair at the crime scene.  (Respondent's Exhibit XV at 1806)  Correll's proposed testimony from the hair expert would have corroborated, not rebutted, the state's case, specifically that Correll's hair was not recovered from the crime scene. As a consequence, Correll fails to show that trial counsel rendered ineffective assistance by not establishing a chain of custody to prove the absence of his hair from the crime scene.

D.  Voluntary Intoxication:

Correll alleges that "trial counsel unreasonably failed to obtain a jury instruction on voluntary intoxication despite testimony adduced by the state that Mr. Correll was

intoxicated on the night of the offense." Correll correctly represents that voluntary

intoxication was a defense to a specific intent crime at that time. The post-conviction

court rejected this claim as follows (Respondent's Exhibit XXXVII at 4):

> Correll next alleged that counsel was ineffective for failing to request
> an intoxication instruction, but since Correll's theory of defense was
> that someone else committed these offenses, counsel cannot be
> deemed ineffective for failing to request such instruction. *Combs v.
> State*, 525 So. 2d 853 (Fla. 1988); *Harich v. State*, 484 So. 2d 1239
> (1984).

Correll's defense was that he did not commit the murders. As a consequence, trial

counsel's not seeking an involuntary intoxication jury instruction was not ineffective

assistance because the instruction would have conflicted with Correll's claim of

innocence. This dichotomy is recognized in both Florida case law and federal case law,

as shown in *State v. Williams*, 797 So. 2d 1235, 1238-39 (Fla. 2001):

> Williams claims that counsel was ineffective for failing to raise the
> voluntary intoxication defense at trial. However, Williams testified
> during the trial that he did not commit the crime. As pointed out by
> this Court in *Williams v. Wainwright*, 503 So. 2d [890,] 891 n. 1 [(Fla.
> 1987)], "[I]ntoxication was not presented at the penalty phase as it
> would have been totally inconsistent with petitioner's theory that he
> did not commit the murder." *See also Lavado v. State*, 469 So. 2d 917,
> 920 (Fla. 3d DCA 1985) (stating that voluntary intoxication defense
> concedes the commission of the act but requests the jury to excuse the
> conduct because the accused was incapable of forming or entertaining
> the intent necessary to commit the crime charged), *quashed on other
> grounds*, 492 So. 2d 1322 (Fla. 1986).
>
> In *Harich v. Dugger*, 844 F.2d 1464 (11th Cir. 1988), *overruled on other
> grounds by Davis v. Singletary*, 119 F.3d 1471 (11th Cir. 1997), the
> Eleventh Circuit held that an attorney was not ineffective for failing to
> request an intoxication instruction when such an instruction was
> inconsistent with the defendant's theory of the case. In *Harich*, the
> defendant took the stand and testified that, although he was with the
> victim the evening of the murder, he was innocent of wrongdoing.

He also indicated that he was under the influence of drugs and alcohol that evening.  Armed with these facts, defense counsel adopted the defense strategy of asserting chiefly factual innocence. The defendant suggested later that defense counsel should have employed the alternative defenses of voluntary intoxication.  The *Harich* court held, however, that a defendant must prove that the approach taken by defense counsel would have been used by no professionally competent counsel and that the approach taken by counsel was one which did not fall "within the objective yardstick that we apply when considering the question of ineffectiveness of counsel." *Id.* at 1471.  The *Harich* court specifically noted that "[a]lthough inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury." *Id.* at 1470 (quoting *Harich v. Wainwright*, 813 F.2d 1082, 1105 (11th Cir. 1987) (Fay, Circuit Judge, dissenting in part, concurring in part)). The *Harich* court concluded that suggesting to the jury that Harich was so drunk that he could not have intended the consequences of his acts would have totally undermined the position taken by Harich himself when he testified.

Correll was in the same position as both Williams and Harich in claiming innocence and his trial counsel applied the same strategy employed in both *Williams* and *Harich*.  As a consequence, Correll fails to show that trial counsel rendered ineffective assistance by not requesting an involuntary intoxication jury instruction.

E.  Electrophoresis Blood Test:

Correll alleges that "[t]rial counsel unreasonably failed to challenge the validity of the electrophoresis process FDLE used by serologist David Baer[,] who analyzed blood stain evidence . . . and subjected the blood to electrophoreses in an attempt to determine the enzymes within each sample."  The post-conviction court rejected this claim as follows (Respondent's Exhibit XXXVII at 4):

Correll next alleged that counsel was ineffective for failing to challenge pretrial the admissibility of the electrophoresis results, as it

would have at least placed the burden on the state to demonstrate the
test's reliability.  Such allegation of prejudice is legally insufficient, as
it fails to show how the result of the proceeding would have been
different.  Counsel did object to the admission of the evidence, thus
preserving the issue for direct appeal, where it was thoroughly argued
and found to be without merit.  *See Correll, supra*, at 566-67.  Correll
has set forth no new information that counsel should have obtained
that would have altered this result in any way.

The post-conviction court correctly noted that trial counsel had objected at trial.

*Correll I*, 523 So. 2d at 566-67, rejected the challenge to the use of the electrophoreses

test as follows:

Correll's final argument pertaining to the guilt phase of his
trial attacks the testimony of David Baer, an expert in the field of
forensic serology, concerning the results of blood tests using the
electrophoresis process. The electrophoresis process is a method used
to determine the presence of certain enzymes in the blood so that
blood may be broken down into more categories than the customary
antigen groups of A, B and O.  As a result of testing blood samples
through the use of this process, Baer was able to express the opinion
that certain blood found at the murder scene could have been
Correll's but could not have been from any of the victims or from
three others who might have been considered to be suspects.  Correll
argues that the admission of the blood test results obtained through
this process was error because the general scientific reliability had not
been shown by the state.

At the outset, it is doubtful that the electrophoresis process can be
properly characterized as a new method of testing blood.  The record
in this case reflects that expert testimony predicated upon the
electrophoresis process has been regularly admitted in Orange County
and throughout the state.  Mr. Baer stated that he had testified more
than seventy times concerning the results obtained by such testing.
This points up the dilemma created by the defense when, during the
course of Baer's testimony, it raised for the first time an objection to
the validity of the electrophoresis process.  One of the reasons given
by the judge for denying the objection was its untimeliness in view of
the fact that the defense had previously taken Baer's deposition and
admitted knowing the basis upon which the objection was to be made
before the trial began.  We find this case in a posture similar to that in
*State v. Harris*, 152 Ariz. 150, 730 P.2d 859 (Ct. App. 1986), where an

objection to expert analysis of semen stains by the electrophoresis
process was first raised at the trial.  The court observed:

> Because the test employed here had previously been
> utilized in criminal trials, there was nothing to suggest to
> the prosecutor the need to assemble experts to
> demonstrate the scientific validity of the method.  The
> defense knew well before trial that such evidence would
> be introduced by the state.  Indeed the physical evidence
> was obtained by defense counsel for independent analysis
> six weeks before trial.  To wait to the day of trial to make
> this motion appears to be an instance of trial by ambush.

152 Ariz. at 152, 730 P.2d at 861.  Thus, we hold that when
scientific evidence is to be offered which is of the same type that has
already been received in a substantial number of other Florida cases,
any inquiry into its reliability for purposes of admissibility is only
necessary when the opposing party makes a timely request for such
an inquiry supported by authorities indicating that there may not be
general scientific acceptance of the technique employed.

In any event, even if the untimeliness of the objection is disregarded,
we cannot say that the judge abused his discretion in permitting Baer
to testify concerning the results of his testing by the electrophoresis
process.  *See Jent v. State*, 408 So. 2d 1024 (Fla. 1981), *cert. denied*, 457
U.S. 1111, 102 S. Ct. 2916, 73 L. Ed. 2d 1322 (1982).  Baer stated that
he had used this method of testing hundreds of times and that the
process was used regularly by the FBI.  He noted that while there was
a controversy in California regarding the accuracy of the test with
respect to dried body fluids, such controversy was apparently the
creation of one individual who was "opposed by just about everybody
in the field."  He specifically stated that the consensus of the persons
in the field was that electrophoresis was an accurate and reliable test.
Significantly, the defense presented no contradictory testimony and
relied only upon the authority of *People v. Young*, 418 Mich. 1, 340
N.W.2d 805 (1983), and *People v. Brown*, 40 Cal. 3d 512, 230 Cal.
Rptr. 834, 726 P.2d 516 (1985), for the proposition that such
testimony should be rejected.  It should be noted that while these two
courts concluded that the records before them did not support the
reliability of testimony predicated upon the electrophoresis process, a
number of other jurisdictions have upheld the admission of such
testimony.  *Jenkins v. State*, 156 Ga. App. 387, 274 S.E.2d 618 (1980);
*State v. Washington*, 229 Kan. 47, 622 P.2d 986 (1981); *State v. Rolls*,
389 A.2d 824 (Me. 1978); *Robinson v. State*, 47 Md. App. 558, 425

A.2d 211 (1981); *State v. Chavez*, 100 N.M. 730, 676 P.2d 257 (Ct. App. 1983); *People v. Crosby*, 116 A.D.2d 731, 498 N.Y.S.2d 31 (1986); *Plunkett v. State*, 719 P.2d 834 (Okla. Cr.), *cert. denied*, ___ U.S. ___, 107 S. Ct. 675, 93 L. Ed. 2d 725 (1986).  There was no error in the admission of Baer's testimony.

Correll contends that trial counsel rendered ineffective assistance by not objecting to the validity of the electrophoresis test and he relies on *People v. Young*, 418 Mich. 1, 340 N.W.2d 805 (1983), and *People v. Brown*, 40 Cal. 3d 512, 230 Cal. Rptr. 834,709 P.2d 440 (1985), as authority for the unreliability of the electrophoresis test.  The record refutes the allegation that counsel failed to object and, moreover, appellate counsel cited *Young* and *Brown* as authority.  As quoted above *Correll I* rejects Correll's *Young* and *Brown* challenge to the electrophoresis test.  As a consequence, *Correll I* determines that the trial court properly admitted the expert witness's testimony—which was based on the results of the electrophoresis test—and that determination of admissibility is largely unassailable in federal court.  *See, e.g., Estelle v. McGuire*, 502 U.S. at 75 ("Nor do our habeas powers allow us to reverse [a] conviction based on a belief that the trial judge incorrectly interpreted the" state's evidence rules.).  *See also Burgett v. Texas*, 389 U.S. 109, 113-14 (1967) (recognizing that a federal petition for the writ of habeas corpus permits only limited authority to review a state court's evidentiary ruling.)  Correll fails to show that trial counsel rendered ineffective assistance of counsel regarding the electrophoresis test.

F.  Witness Lawrence Smith:

Correll alleges that trial "[c]ounsel unreasonably failed to move to suppress Mr.

Correll's statements to snitch Lawrence Smith, whose testimony was incriminating . . .

despite the fact that Smith was never told by Mr. Correll that he committed the

murders."  The post-conviction court rejected this claim as follows (Respondent's

Exhibit XXXVII at 4-5):

> Correll next alleged that Lawrence Smith was a government
> informant and that counsel was ineffective for failing to investigate
> this issue and move to suppress Correll's statements to him.  This
> claim is legally insufficient [because] there are no factual allegations
> to support the claim that Smith was a government informant.  For the
> same reason, prejudice has not been demonstrated, nor has deficient
> performance, as there is also a lack of factual allegations as to what
> should have put counsel on notice that Smith was a government
> informant.  Further, there is nothing in the record to support the
> allegation that Smith was a government informant.

Lawrence Smith and Correll were confined in the Orange County jail in

adjoining but separate cells while in segregated housing.  As a consequence, they would

talk while in their respective cell and while they walked in the jail's recreation area.

The primary facts in Smith's trial testimony are (1) that Correll admitted "he was there

that night," (2) that Correll claimed to have hired a friend in a motorcycle gang to kill

Susan, (3) that Correll claimed some friends were going to "set up" an alibi for him,

and (4) that Correll claimed any jury would believe he was insane to have murdered his

daughter.[29]

---

[29]  Smith's knowledge about facts of the crime scene that were not reported in the newspaper
supports Smith's representation that Correll revealed this information to him rather than Smith's
(continued...)

Correll contends that Smith was a "professional snitch" and that the State purposely moved Correll into the cell adjoining Smith, who had obtained incriminating evidence against a detainee named Hodge.  Correll's allegations about Smith's divulging information to law enforcement were revealed to trial counsel during Smith's lengthy deposition.  (Respondent's Exhibit XXVII at 3640-764)

Smith was confined in a single cell in the jail's maximum security area because earlier he successfully escaped from a less secure area of the jail.  (*Id.* at 3658)  Smith was always held inside this secure area unless he was moved to the jail annex for easier access to the courthouse.  Hodge was confined in this secure area possibly because, according to Smith's counsel, Hodge was reportedly involved with organized crime.  (*Id.* at 3669)  Correll was moved into this high security area because officers found a knife hidden inside his mattress.[30]  (*Id.* at 3681)

The transcript of the deposition shows that Smith gained no benefit from having revealed information to law enforcement about Hodge's admitting to a murder in Kentucky.  The detectives from Kentucky who interviewed Smith told him that they could not assist him with his pending Florida criminal charges, except to write a letter

---

[29](...continued)
reading articles in the newspaper.  In his deposition, Smith testified that Correll complained that a newspaper article was wrong about the location of his fingerprints adjacent to the thermostat.  The newspaper articles (Respondent's Exhibit XXXIV) never reveal the location of the thermostat.  In his deposition Smith correctly identified the location of the thermostat inside the house and the location of Correll's bloody fingerprints in relation to the thermostat.  (Respondent's Exhibit XXVII at 3715)

[30]  In his deposition Smith represented that Correll intended to use the knife "if things looked real bad and he had to escape."  (Respondent's Exhibit XXVII at 3681)

verifying his assistance.  Smith's public defender advised him that he was unlikely to

benefit from the assistance and, in fact, later told Smith that the prosecutor was "not

interested."  (*Id.* at 3668-70)  Smith stated that he disclosed the information because he

was "appalled at what [Hodge] had done" and that because he does not "condone

murder whatsoever[, it] was my duty to" report the information.  (*Id.* at 3669-70)  Smith

stated that no law enforcement officer ever suggested that he should attempt to acquire

information from Hodge.  (*Id.* at 3672)

      Correll moved into the cell adjoining Smith's cell after another detainee was

transferred from the adjoining cell to another facility.  After a few weeks Correll began

telling Smith about his case and asking whether Smith thought a jury would convict

him.  (*Id.* at 3681-82)  Smith and Correll were in adjoining cells for about two-and-a-

half months.  Immediately after Smith revealed Correll's statements to the prosecutors,

Smith was moved into a cell away from Correll.  (*Id.* at 3685)  Smith received no

promise for his cooperation against Correll.  (*Id.* at 3694)  At the conclusion of his

deposition, Smith again stated that he received no promise for any of his cooperation.

(Id. at 3764)

      Correll's allegations that Smith was a "professional snitch" and that Correll's

housing assignment was "orchestrated [to] obtain incriminating statements" are

factually unsupported.  The post-conviction court correctly determined that "there is

nothing in the record to support the allegation that Smith was a government

informant."  Correll's contention that law enforcement "orchestrated" Smith's

occupying the cell next to Correll is refuted by law enforcement's removing Smith after learning about Correll's admissions to Smith.  Presumably, if Smith was part of a surveillance plan, law enforcement would have returned Smith to the same cell to acquire more information.

## IX.  INEFFECTIVE ASSISTANCE OF COUNSEL: PENALTY PHASE

*Strickland*'s deficient performance and prejudice test—for proving whether counsel rendered ineffective assistance of counsel—controls in a penalty phase.  The deficient performance component is unchanged but the prejudice component alters slightly so that "the prejudice question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *DeYoung v. Schofield*, 609 F.3d 1260, 1284 (11th Cir. 2010) (quotation marks and ellipsis omitted), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1691 (2011).  *Strickland*, 466 U.S. at 695-96, explains more fully:

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the

record is more likely to have been affected by errors than one with
overwhelming record support.  Taking the unaffected findings as a
given, and taking due account of the effect of the errors on the
remaining findings, a court making the prejudice inquiry must ask if
the defendant has met the burden of showing that the decision
reached would reasonably likely have been different absent the errors.

"In assessing prejudice under *Strickland*, the question is not whether a court can
be certain counsel's performance had no effect on the outcome or whether it is possible
a reasonable doubt might have been established if counsel acted differently."  *Harrington
v. Richter*, 131 S. Ct. at 791.  Instead, the above quotation from *Strickland* shows that a
petitioner must prove the existence of a reasonable probability of a different result.  "A
reasonable probability is a probability sufficient to undermine confidence in the
outcome."  131 S. Ct. 787.  "The likelihood of a different result must be substantial, not
just conceivable."  131 S. Ct. at 792.

<u>Ground II</u>
Mr. Correll was denied effective assistance of counsel at the
sentencing phase of his trial, in violation of the Sixth, Eighth,
and Fourteenth Amendments to the United States Constitution.

Correll alleges that "[t]rial counsel's unreasonable failure to adequately
investigate and prepare for the penalty phase violated the Sixth Amendment."  Defense
counsel's obvious strategy at the penalty phase was to "humanize" Correll by showing
both that he was a good person who deserved life imprisonment and that Correll had
little chance of killing again.  In his federal petition Correll alleges that counsel
(1) "failed to discover and present available evidence of extreme intoxication as
mitigation," (2) failed to present significant mitigating evidence that counsel possessed,

(3) "failed to investigate, develop and present" extensive evidence of Correll's drug abuse, and (4) "failed to investigate, develop, and present the circumstances of Mr. Correll's impoverished and abusive childhood."[31]  The post-conviction court rejected this claim of ineffective assistance of counsel, stating (Respondent's Exhibit XXXVII at 6-7):

> Claim VII, that Correll was denied effective assistance of counsel at the sentencing phase of his trial because counsel failed to adequately investigate, is refuted by the record.  Counsel's conduct is to be judged on the facts of the particular case, without hindsight, and the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  *Strickland, supra*.  Counsel first obtained background information on Correll, including school records, and then had him examined by a psychiatrist, pointing out to the psychiatrist that Correll had a history of drug use.  Correll himself denied regular drug use, and also stated that he had a normal upbringing and good relationship with his family.  Testimony of Correll's family at the penalty phase corroborates these statements.  Correll and his family surely knew the details of his background, and no allegation is made that they were not asked about these details or that counsel refused to utilize what he was told.  Just as counsel cannot be deemed ineffective for failing to present witnesses who do not want to testify, *Cave v. State*, 529 So. 2d 293 (Fla. 1988), or for not interviewing witnesses where he has been instructed not to do so, *Eutzy v. State*, 536 So. 2d 1014 (Fla. 1988), or has been prohibited from doing so, *Henderson v. Dugger*, 522 So. 2d 835 (Fla. 1988), counsel cannot be deemed ineffective for failing to obtain evidence totally contrary to what he has been told by the defendant, the defendant's family, the defendant's statements to the police and the psychiatrist, and the defendant's testimony.

---

[31] Correll also alleges that counsel "failed to object to testimony of Dr. Hegert when he testified to his opinions of crime reconstruction and the emotional pain suffered by the victims." This allegation is presented in a single sentence and not developed further in either the third amended petition (Doc. 119) or the reply.  (Doc. 123)  In the state post-conviction proceedings Correll never alleged that counsel's failure to object was ineffective assistance.  Consequently, the claim is unexhausted and not reviewable in this federal proceeding.

Further, this court would not have been persuaded to impose a
sentence of life imprisonment on the basis of any additional
information contained in the 3.850 motion, nor can it be said that
such information would have resulted in a life recommendation from
the jury.  Such information in itself is non-persuasive and contrary to
the evidence that was presented and argued in mitigation.  Counsel
did not fail to investigate but offered the information that was
imparted to him by Correll and his family.  This was a quadruple
murder, and in imposing four death sentences this court found six
aggravating circumstances, which clearly outweigh any of the
now-proffered evidence.  This court need not use its limited resources
to conduct an unwarranted evidentiary hearing where Correll's
allegations of lack of investigation are refuted by the record and the
sentencing outcome would have remained the same in any event.

On appeal *Correll II*, 558 So. 2d at 425-26, rejected this claim of ineffective

assistance of counsel at the penalty phase:

Specifically, Correll asserts that counsel knew or should have known
that he had a lifetime history of heavy drug and alcohol usage but
failed to introduce such evidence at the penalty phase.  He also
contends that trial counsel should have introduced available evidence
of a deprived childhood.

There is no doubt that counsel was aware of Correll's prior drug and
alcohol usage.  In fact, Correll testified that he had used alcohol and
various kinds of drugs often, though not on a regular basis,
throughout his adult life.  Correll now submits affidavits from friends
which recite the frequent use of an assortment of drugs and argues
that counsel was ineffective for failing to present these witnesses.

In response, the state points out that there was no evidence of any
drug usage or excessive drinking the night of the murders.  The state
further points out that Correll told Dr. Pollack, the psychiatrist who
examined him prior to trial, that he used alcohol several times a week
and that he had experimented with various drugs, though not on a
regular basis.  Dr. Pollack concluded that he was not legally insane,
that he did not suffer from brain damage, and that neither of the
statutory mental mitigating circumstances was applicable.  Thus, the
state suggests that it was reasonable for trial counsel not to try to
portray Correll as a heavy drug user but rather as a person who was
good to his mother and brothers and one who had found religion and
who was unlikely to be dangerous in the future.

In view of the fact that Correll continued to insist that he was not guilty of the crimes, we can understand why counsel may not have wanted the jury to believe that he was an alcoholic and a drug addict. However, because there was no evidentiary hearing on this issue, we do not pass on whether counsel provided [deficient performance].[32] Rather, we conclude that Correll has failed to meet the second prong of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires a showing that but for such ineffectiveness, the outcome probably would have been different.

Assuming that counsel had introduced all of the proffered evidence of drug use and intoxication, we are convinced that neither the jury nor the trial judge would have been persuaded to arrive at a different result.[2] Viewed in light of the heinous nature of these four murders and the abundance of aggravating circumstances, the additional evidence simply would not have made any difference.[3]

[2] The trial judge so stated in his order denying post-conviction relief.

[3] As to Correll's claim that his trial counsel was ineffective for failing to delve deeply enough into his purported family history, the record is sufficient for us to conclude that counsel was not ineffective. Counsel presented the testimony of Correll's mother, his brother, and his brother's wife. Neither the brother nor the sister-in-law had known Correll well as a child (the brother being fifteen years older), but the mother described her son as a "happy-go-lucky" boy who had a normal childhood. When Correll testified, he, too, painted a picture of a normal boyhood and said he was close to and loved his father. Correll now alleges an abusive upbringing, with his deceased father as the cause of his misery. If this account is true, trial counsel cannot be faulted for failing to know it, given the fact that diametrically opposite testimony was given by Correll and his mother.

---

[32] *Strickland* requires a showing of both deficient performance and prejudice to prove ineffective assistance of counsel. The order erroneously states "ineffective assistance" instead of "deficient performance." Clearly the court intended to say that they would "not pass on whether counsel" performed deficiently rather than "whether counsel provided ineffective assistance" because the court immediately discusses prejudice, the second component of *Strickland*.

The record supports the state courts' findings of fact about both the defense's trial strategy at the penalty phase and the trial testimony presented by Correll and his family members at the penalty phase.[33]  *Correll II* rejects this claim because Correll fails to show prejudice and the order elects not to address the deficient performance component. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").  Actually, Correll proves neither deficient performance nor prejudice.

---

[33]  This order earlier addressed ground VII—in which Correll alleges that the trial court failed to find mitigating circumstances apparent from the record—and recounts the following facts:

> Correll's mother testified that in his youth Correll was "happy go lucky, loved to fish, [and] swim" (Respondent's Exhibit XVII at 1893), a description that Correll confirmed when he testified that he had a normal childhood. (*Id.* at 1934)  Both Correll and his mother testified that he had a good relationship with his father. (*Id.* at 1894, 1936, and 1939)  Both Correll's mother and his brother testified that Correll never exhibited violence. (*Id.* at 1894 and 1896)  Correll, his mother, his brother, and his brother's wife testified that Correll was good to his little girl (Tuesday), such as taking her to beaches, parks, picnics, and "cook-outs." (*Id.* at 1895, 1897, 1899, and 1948)  After his divorce Correll moved into his mother's home and helped her around the house. (*Id.* at 1950)  Both Correll and his brother's wife testified that after Correll's arrest for the murders he started reconnecting with his religious roots. (*Id.* at 1903-04 and 1941-42)  Finally, Correll presented a sociologist who testified that Correll's lack of a criminal record and his familiar relationship with the victims imply that Correll had little chance of committing a similar offense. (*Id.* at 1927-28)

> During the penalty hearing Correll admitted that he was not without some faults. Correll admitted to consuming alcohol and smoking marijuana since he was seventeen or eighteen years old and to using "crystal meth, cocaine, various other drugs . . . on and off . . . [but] not on a regular basis." (*Id.* at 1939-40)  He also testified (1) that he and Susan divorced because she suspected that he was having an affair when he was working long hours and (2) that she started "drinking pretty heavy" and "I was doing cocaine." (*Id.* at 1947)  After the divorce they "lived apart" and "moved back in together quite a few different times." (*Id.* at 1948)

Correll faults trial counsel for not investigating further.  Whether counsel should have investigated further is determined by what counsel knew and is not based on either hindsight or what counsel would have discovered by investigating further.

> Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced.  Nor do we need to decide whether the information that would have resulted from further investigation would have necessarily been used at trial by every reasonable lawyer who was armed with such information.  If the act of conducting no investigation of a particular defense is reasonable, the matter is closed; there can be no question about the reasonableness of having failed to present evidence of which the lawyer was unaware as a result of a reasonable decision to investigate no further.

*Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir.), *cert. denied*, 513 U.S. 899 (1994).

Additionally, *Strickland*, 466 U.S. at 691, reports that the attorney who represented Charles E. Strickland faced circumstances similar to those faced by Correll's trial counsel:

> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

The extent of counsel's investigation was reasonable under the circumstances. *See Strickland*, 466 U.S. at 688 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."). Correll's trial counsel possessed information (1) that Correll had a normal childhood, (2) that he had a good relationship with his father, (3) that he was good to both his mother and his daughter, and (4) that, although he had a history of both alcohol and drug use, Correll represented that his prior drug use was not extensive. Counsel also possessed the findings of the mental health expert. The post-conviction court correctly determined that "counsel cannot be deemed ineffective for failing to obtain evidence totally contrary to what he has been told by the defendant, the defendant's family, the defendant's statements to the police and the psychiatrist, and the defendant's testimony." (Respondent's Exhibit XXXVII at 7)

Correll faults counsel for not investigating and presenting evidence of Correll's drug abuse. Correll identifies Robert and Wendy Garrett as witnesses who could have testified to Correll's extensive drug use. As Correll recognizes, trial counsel deposed both individuals. As a consequence, counsel knew that each could testify that Correll allegedly had an extensive history of drug use. But the deposition also showed that the witnesses could reveal that Correll and Susan had a "stormy relationship," one in which Correll physically and verbally abused both Susan (including Robert Garrett seeing Correll slap Susan across the face for having spilled a cup of tea and Wendy Garrett frequently seeing Susan with a black eye) and Tuesday (including Robert Garrett

testifying that Correll complained that Tuesday "was a pain in the ass" and Wendy

Garrett seeing welts on Tuesday).[34]   Correll fails to show that counsel performed

deficiently by not investigating further and not presenting the testimony of the two

Garretts.  To the contrary, the Garretts' testimony could have been more prejudicial

than helpful.  "[A]pplying a heavy measure of deference to counsel's judgments,"

*Strickland*, 466 U.S. at 691, the record fails to support the allegation that counsel

performed deficiently, either by not conducting additional investigations or by not

presenting certain evidence.

Ground III

Mr. Correll received ineffective assistance of a mental health
expert and trial counsel in violation of Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution.

Correll alleges that defense counsel rendered ineffective assistance by failing to

properly investigate Correll's background and, as a consequence of this failure, Dr.

Pollack—the mental health expert who examined Correll before trial—was unable to

render a professional opinion.[35]   Correll alleges that his new experts have found ample

evidence of Correll's mental ill-health and his abuse of both drugs and alcohol.

The first inquiry is to determine what counsel knew before he employed Dr.

Pollack.  "[A] court deciding an actual ineffectiveness claim must judge the

---

[34]   Depositions of Robert Garrett (Respondent's Exhibit XX at 2245-66) and Wendy Garrett (Respondent's Exhibit XXI at 2690-701).

[35]   This ground is limited to counsel's allegedly inadequate investigation before employing Dr. Pollack.  Correll's general claim of counsel's allegedly ineffective assistance by failing to properly develop mitigation evidence is addressed in ground II.  Correll's allegation that Dr. Pollack failed to conduct a proper evaluation of Correll was addressed earlier as a guilt phase claim.

reasonableness of counsel's challenged conduct on the facts of the particular case,

viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.  In his

introductory letter to Dr. Pollack (Exhibit 4, Third Amended Petition, Doc. 119)

defense counsel identified two specific issues, particularly the state of Correll's mental

health and his use of "all kinds of drugs for several years."  Additionally, the letter

advised Dr. Pollack that Correll's school records showed no signs of behavioral or

emotional problems. Consistent with this background information, Correll and his

relatives testified that (1) Correll had a normal childhood, (2) that he had a good

relationship with his father, (3) that he was good to both his mother and his daughter,

and (4) that, although he had a history of both alcohol and drug use, his prior drug use

was not extensive.  Defense counsel's decision to not investigate further was not

unreasonable.  "[W]hen the facts that support a certain potential line of defense are

generally known to counsel because of what the defendant has said, the need for further

investigation may be considerably diminished or eliminated altogether.  And when a

defendant has given counsel reason to believe that pursuing certain investigations

would be fruitless or even harmful, counsel's failure to pursue those investigations may

not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

Ground X

The jury's sentencing responsibility was diminished and trial
counsel ineffectively failed to litigate the issue.

Correll alleges that "the jury was repeatedly told that it was the court, not the jury, that decided the sentence."  Correll contends that the trial court's statements violate the holding in *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985):

> [W]e conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere.

*Correll II*, 558 So. 2d at 425 n.1(7) and at 426-27 n.6 (Claim XIX), found the underlying substantive claim procedurally barred.  Correll admits that the underlying substantive claim is procedurally barred from federal review.  (Third Amended Petition at 50, Doc. 119)  Consequently, this ground is limited to the claim of ineffective assistance of trial counsel for failing to object to the trial court's allegedly improper statements to the jurors.  *Correll II*, 558 So. 2d at 426-27 n.6 (Claim XIX), summarily rejected the claim of ineffective assistance of counsel by parenthetically stating that the "[i]neffective assistance of counsel claim contained therein is without merit."

The post-conviction court rejected the claim of ineffective assistance of trial counsel, stating (Respondent's Exhibit XXXVII at 12):

> Claim XIX, that Correll's sentencing jury was repeatedly misled by instructions and arguments which diluted their sense of responsibility, is procedurally barred as it was not preserved at trial or raised on direct appeal.  *King v. Dugger*, 15 F.L.W. S11 (Fla. January 4, 1990). *Caldwell v. Mississippi*, 472 U.S. 320 (1985), is not a change in the law nor is it applicable to Florida, *Combs v. State*, 525 So. 2d 853 (Fla. 1988), so counsel's effectiveness cannot be implicated.

Trial counsel's failure to object was not ineffective assistance because an attorney is not responsible for future changes in the law.

> In this circuit, we have a wall of binding precedent that shuts out
> any contention that an attorney's failure to anticipate a change in the
> law constitutes ineffective assistance of counsel. *See, e.g., Spaziano v.
> Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many
> times that '[r]easonably effective representation cannot and does not
> include a requirement to make arguments based on predictions of
> how the law may develop.'"); . . . *Davis v. Singletary*, 119 F.3d 1471,
> 1476 (11th Cir.1997) ("[i]t was not professionally deficient for
> [counsel] to fail to anticipate that the law in Florida would be changed
> in the future to bar the admission of hypnotically induced
> testimony.") *Pitts v. Cook*, 923 F.2d 1568, 1572-74 (11th Cir. 1991);
> *Thompson v. Wainwright*, 787 F.2d 1447, 1459 n.8 (11th Cir. 1986)
> ("defendants are not entitled to an attorney capable of foreseeing the
> future development of constitutional law").  That rule applies even if
> the claim based upon anticipated changes in the law was reasonably
> available at the time counsel failed to raise it.  *See, e.g., Pitts*, 923 F.2d
> at 1572-74 (holding that even though a claim based upon the 1986
> *Batson* decision was "reasonably available" to counsel at the time of
> the 1985 trial, failure to anticipate the *Batson* decision and raise that
> claim was not ineffective assistance of counsel).
>
> Further, the rule that it is not ineffective assistance for an attorney to
> fail to foresee a change in the law applies even when the change is
> such that the forfeited issue was, in hindsight, a sure fire winner.
> *Wright v. Hopper*, 169 F.3d 695, 707-08 (11th Cir. 1999) (*Batson* issue);
> *Elledge v. Dugger*, 823 F.2d 1439, 1443 (11th Cir. 1987) (*Michigan v.
> Mosley* issue); *Thompson*, 787 F.2d at 1459 n.8 (*Ake* issue).

*United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001) (brackets original) (citations to

additional cases omitted), *cert. denied*, 535 U.S. 979 (2002).  Although *Caldwell* predates

Correll's trial by a few months, *Combs*—which was issued before *Correll*'s post-

conviction proceeding— holds that *Caldwell* is inapplicable in Florida because, unlike in

Mississippi, a judge decides the final sentence and not the jury.  Correll's jury was

properly instructed about their role in determining the sentence.  As a consequence, trial

counsel had no reason to object because no *Caldwell* violation occurred.  "To establish a

*Caldwell* violation, a defendant necessarily must show that the remarks to the jury

improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489

U.S. 40, 407 (1989). As a consequence, ground X affords Correll no relief.

## X.  INEFFECTIVE ASSISTANCE OF COUNSEL: DIRECT APPEAL

### Ground VI (1)
Mr. Correll was denied effective assistance of counsel during his direct appeal in violation of the Sixth, Fifth and Fourteenth Amendments to the United States Constitution.

> Denial of right to cross-examination and to present a defense when trial court refused to permit trial counsel to question Donna Valentine about Susan Correll's drug usage.

Correll's defense was that someone else committed the murders and he

speculated that the murders were possibly the result of a "drug deal gone bad." The

trial court precluded the introduction of evidence about Susan's alleged drug use.

Correll challenges appellate counsel's alleged ineffectiveness for not challenging the trial

court's ruling.

The prosecution filed a motion *in limine* (Respondent's Exhibit XXVIII at 3944)

to preclude testimony about Susan's history of drug use. In a pre-trial hearing, the trial

court "reserv[ed] ruling on the motion *in limine* until such time as I have enough

information concerning relevancy and the questions raised." (Respondent's Exhibit

XVIII at 2187) Consistent with the pre-trial ruling, defense counsel requested a side-bar

conference at which he announced his desire to cross-examine a witness about Susan's

alleged drug use. The trial court rejected the request based on a lack of relevance.

(Respondent's Exhibit V at 542-44)

In his petition Correll alleges that appellate counsel rendered ineffective assistance for not challenging the trial court's "denial of [his] right to cross-examination and to present a defense when the trial court refused to permit trial counsel to question Donna Valentine about Susan Correll's drug usage." *Correll II*, 558 So. 2d at 424, rejected this ground with the following analysis:

> In his petition for habeas corpus, Correll first argues that his appellate counsel was ineffective for failing to argue that his right to confront the witnesses against him was denied when the court limited cross-examination of a state witness. Correll refers to a trial court ruling which precluded his attorney from asking Donna Valentine on cross-examination whether Susan Correll had been smoking marijuana on the night before she was killed. The trial judge apparently believed that this evidence was irrelevant. Clearly, this was not a point upon which appellate counsel could reasonably rely to reverse Correll's conviction. Contrary to Correll's suggestion, the fact that [Susan] smoked marijuana would not have supported a theory that she was killed as a result of a "drug deal gone bad."

*Strickland* governs a claim of ineffective assistance of appellate counsel. "The standards applicable to [a defendant]'s claims of ineffectiveness against trial counsel apply equally to the charges leveled against his appellate lawyer." *Johnson v. Alabama*, 256 F.3d at 1187. Although this pre-AEDPA action is entitled to *de novo* review without deference to the state court's decision, counsel's decisions are still entitled to deference. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 131 S. Ct. at 788.

The underlying basis for Correll's claim of ineffective assistance of appellate counsel challenges the trial court's ruling on the admissibility of evidence, which is a matter of state law. Nevertheless, "the issue of ineffective assistance – even when based

on the failure of counsel to raise a state law claim – is one of constitutional dimension."
*Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984).

Correll complains that appellate counsel failed to challenge the trial court's excluding evidence of Susan's alleged history of drug use. *Strickland*'s deficient performance component is not met simply because appellate counsel fails to raise a particular issue on appeal. Counsel need not raise every non-frivolous issue on appeal. *Jones v. Barnes*, 463 U.S. 745 (1983). *See also Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent [because] . . . 'only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'") (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). An appellate advocate provides effective assistance by "winnowing out" a weaker claim and focusing on a stronger claim:

> It is difficult to win a *Strickland* claim on the grounds that appellate
> counsel pressed the wrong legal arguments where the arguments
> actually pursued were reasonable in the circumstances. We have
> emphasized that even in a death penalty case, counsel must be
> "highly selective about the issues to be argued on appeal . . . ."
> *United States v. Battle*, 163 F.3d 1, 1 (11th Cir. 1998). The district
> court, having considered the record and [appellate counsel]'s
> testimony during the state post-conviction proceeding, found that
> [appellate counsel] had carefully considered many of the claims now
> raised in appeal, but ultimately chose to pursue the claims he felt were
> most likely to prevail and winnow out the arguments he thought were
> less persuasive.

*Johnson v. Alabama*, 256 F.3d at 1188.  To summarize, deficient performance is not

established merely because appellate counsel fails to raise every conceivable issue.

To prove that appellate counsel rendered ineffective assistance, Correll would

have to show both deficient performance and prejudice.  *Correll II* determined that

"[c]ontrary to Correll's suggestion, the fact that [Susan] smoked marijuana would not

have supported a theory that she was killed as a result of a 'drug deal gone bad.'"

Based on that determination the court found that the underlying evidence was

inadmissible under state law and, as a consequence, the court would have rejected the

issue Correll complains that appellate counsel should have raised.  Because Correll

proves neither deficient performance nor prejudice, ground VI(A) lacks merit.

Ground VI (2)

Mr. Correll was denied effective assistance of counsel during his
direct appeal in violation of the Sixth, Fifth and Fourteenth
Amendments to the United States Constitution.

Excessive security measures, including shackling of
Mr. Correll at trial.  Trial counsel repeatedly alerted
the court to the problems.

Twice Correll presented his shackling claim to the state courts, first in his Rule

3.850 motion to vacate as a substantive claim and second in his state petition for the

writ of habeas corpus as a claim of ineffective assistance of appellate counsel.  Both the

post-conviction court and *Correll II*, 558 So. 2d at 426-27 n.6 (Claim IV), summarily

rejected the substantive claim without elaboration other than identifying it as a claim

that was "raised or should have been raised on direct appeal."  *Correll II* addresses and

- 104 -

rejects the merits of the ineffective assistance of appellate counsel claim.  As a

consequence, the substantive claim is procedurally barred from federal review[36] but the

claim of ineffective assistance of appellate counsel is entitled to a review on the merits.

This shackling claim is based on the following events.

A.  Facts:

   The murders occurred in Orange County, Florida.  After determining that

empaneling an impartial jury was unlikely in Orange County, Correll's

quadruple-murder trial was moved to Sarasota County.  Correll committed the murders

by repeated stabbing each victim.  While in pre-trial confinement in the Orange County

jail, Correll made a knife that he could use to escape and that he hid inside of his

mattress.  Because of the seriousness of the pending criminal charges and because

Correll fashioned while in jail a knife to facilitate his escape, the Sarasota County court

security officers considered Correll a security risk.

   In a pre-trial hearing before *voir dire* for the trial in Sarasota County, defense

counsel expressed to the trial judge his concern that members of the venire could

possibly see that Correll's ankles were shackled.  (Respondent's Exhibit I at 10-14)

After *voir dire* began and during a sidebar conference, defense counsel advised the trial

judge that the members of the venire were entering the courtroom from a different

---

[36] Correll shows neither "cause and prejudice" nor "manifest injustice" to overcome the
procedural default.

direction, which might allow them to see that Correll was shackled (Respondent's

Exhibit I at 62-63):

> [Defense Counsel]:  They are coming in the other side and they can
> see his shackles.
>
> The Court:  Have him hold his feet under the table more.
>
> [Defense Counsel]:  There is no way.  All I can do is pull the table
> around further.
>
> The Court:  Okay.
>
> [Defense Counsel]:  No problem with that?
>
> The Court:  No.
>
> [Defense Counsel]:  Alright.
>
> The Court:  Mr Bailiff, pull that table around a little bit further,
> please.

This adjustment to the courtroom apparently satisfied defense counsel because the

record contains no additional objection.

B.  The Substantive Claim:

In his Rule 3.850 motion to vacate Correll argued that the shackling "destroyed

any presumption of innocence and perverted the judicial process."  The post-conviction

court rejected this claim as procedurally barred (Respondent's Exhibit XXXVII at 5):

> The facts supporting this claim, that the use of shackles perverted the
> judicial process, are contained in the trial record, so it is one that
> could and should have been brought on direct appeal and is thus
> procedurally barred.  *Mikenas*[ *v. State*, 460 So. 2d 359 (Fla. 1984)].
> This court applied existing constitutional  principles at the time of
> trial, and in accordance with *Witt v. State*, 387 So. 2d 922 (Fla. 1980)
> and *Teague v. Lane*, 109 S. Ct. 1060 (1989), it will not fashion new
> rules in collateral proceedings based on the decisions of intermediate

> federal courts.  This court conducted an inquiry into the matter at the
> time and determined that the leg irons were necessary to ensure the
> security and safety of the proceeding considering the incident Correll
> was involved in at the county jail and the charges he was facing, and
> in addition measures were taken to ensure that the shackles would not
> be seen by members of the jury, thus minimizing any potential
> prejudice.

*Correll II*, 558 So. 2d at 426 n.6, applied the same reasoning for not reviewing the claim.

To the extent that Correll presents a substantive challenge to the shackling, that claim is

procedurally barred.

Correll, citing *Deck v. Missouri*, 544 U.S. 622 (2005), argues that shackling

violated his right to due process.  *Deck*, 544 U.S. at 629, established a new rule of

criminal procedure:

> Lower courts have disagreed about the specific procedural steps a trial
> court must take prior to shackling, about the amount and type of
> evidence needed to justify restraints, and about what forms of
> prejudice might warrant a new trial, but they have not questioned the
> basic principle.  They have emphasized the importance of preserving
> trial court discretion (reversing only in cases of clear abuse), but they
> have applied the limits on that discretion described in *Holbrook*,[37]
> *Allen*,[38] and the early English cases.  In light of this precedent, and of
> a lower court consensus disapproving routine shackling dating back to
> the 19th century, it is clear that this Court's prior statements gave
> voice to a principle deeply embedded in the law.  We now conclude
> that those statements identify a basic element of the "due process of
> law" protected by the Federal Constitution.  Thus, the Fifth and
> Fourteenth Amendments prohibit the use of physical restraints visible
> to the jury absent a trial court determination, in the exercise of its
> discretion, that they are justified by a state interest specific to a
> particular trial.  Such a determination may of course take into account
> the factors that courts have traditionally relied on in gauging potential
> security problems and the risk of escape at trial.

---

[37] *Holbrook v. Flynn*, 475 U.S. 560 (1986).

[38] *Illinois v. Allen*, 397 U.S. 337 (1970).

Correll cannot benefit from this new rule, which was established twenty years after

Correll's trial, because "*Deck* . . . does not apply retroactively . . . ." *Marquard v. Sec'y,*

*Dep't of Corr.*, 429 F.3d 1278, 1311 (11th Cir. 2005), *cert. denied* 547 U.S. 1181 (2006).

Consequently, even if not procedurally barred from federal review, Correll would gain

no relief based on the underlying substantive claim challenging the necessity for

shackling.

C.  The Ineffective Assistance of Appellate Counsel:

        The only issue reviewable in this ground is whether appellate counsel rendered

ineffective assistance for failing to assert the shackling challenge on direct appeal.

Federal review of a shackling claim is limited, even based on pre-AEDPA controlling

 precedent:

> All a federal court may do in such a situation is look at the scene
> presented to jurors and determine whether what they saw was so
> inherently prejudicial as to pose an unacceptable threat to defendant's
> right to a fair trial; if the challenged practice is not found inherently
> prejudicial and if the defendant fails to show actual prejudice, the
> inquiry is over.

*Holbrook v. Flynn*, 475 U.S. 560, 572 (1986).  Of importance is the discretion reserved to

the trial judge to determine whether shackling is necessary.  "Trial judges are given

reasonable discretion in balancing the state's interests in shackling and the defendant's

right to appear 'untainted by physical reminders of his status as an accused,' and in

determining whether shackles are appropriate."  *Holladay v. Haley*, 209 F.3d 1243, 1255

(11th Cir.), *cert. denied*, 531 U.S. 1017 (2000).

*Correll II*, 558 So. 2d at 424, rejected this claim of ineffective assistance of

appellate counsel with the following analysis:

> Correll also claims that appellate counsel was ineffective for failing to argue that the trial court caused an unconstitutional conviction and sentence by permitting him to be shackled during the trial.  When trial counsel objected to the shackles, the court was advised that Correll previously had been found in possession of a comb fashioned into a knife while in jail and concluded that he was a security risk.  On this record, appellate counsel would have had little chance of persuading this Court that the trial judge abused his discretion in permitting Correll to be shackled.  *See Stewart v. State*, 549 So. 2d 171 (Fla. 1989), petition for cert. filed, No.89-6298 (U.S. Dec. 15, 1989).  Moreover, to the extent that it can be determined from this record, it appears that the court caused something to be placed in front of the counsel table in order to hide the shackles from the jury.

Based on the security concerns expressed by the judge, both at trial and in his

post-conviction order, this record shows no abuse of the discretion to require shackling.

Further, the trial judge's proper use of discretion supports the determination in *Correll II*

that "appellate counsel would have had little chance of persuading this Court that the

trial judge abused his discretion in permitting Correll to be shackled."  *Correll II*'s

rejection of this ground is consistent with federal precedent.  *See, e.g.*, *Holladay*, 209 F.3d

at 1256 ("In light of the [security concerns that warranted shackling in this death

penalty action] and the standard of review that these claims [ – whether appellate

counsel rendered ineffective assistance for not challenging on direct appeal either the

shackling or security measures – ]would be subjected to, it was not deficient

representation not to raise them on appeal.").  Correll fails to show that appellate

counsel performed deficiently and *Correll II* already correctly determined that Correll

cannot show prejudice.  As a consequence, Correll is entitled to no relief based on

ground VI.

<u>Ground VI (3)</u>
Mr. Correll was denied effective assistance of counsel during his
direct appeal in violation of the Sixth, Fifth and Fourteenth
Amendments to the United States Constitution.

Denial at penalty phase of a requested instruction
regarding mercy for the defendant.

During the penalty phase, Correll proposed the following jury instruction, which

the trial court rejected (Respondent's Exhibit XXIX at 4086):

With regard to your decision to recommend life or death, the court
hereby instructs you that there is nothing which would suggest that
the decision to afford an individual defendant mercy violates our
Constitution.  You are empowered to decline to recommend the
penalty of death even if you find one or more aggravating
circumstance and no mitigating circumstance.

In a state petition for extraordinary relief in the Florida Supreme Court under

Rules 9.030(a)(3) and 9.100(a), Florida Rules of Appellate Procedure (Respondent's

Exhibit XXXVIII), Correll alleged that appellate counsel rendered ineffective assistance

by not challenging the trial court's denial of the proposed jury instruction.  *Correll II*,

558 So. 2d at 424, rejected this ground with the following analysis:

Finally, Correll contends that his appellate counsel should have
argued that the trial court erred in refusing to give a penalty phase
instruction that the jury could properly consider mercy during the
course of its deliberations.  However, the court gave the standard jury
instructions with respect to sentencing, including the advice that the
jury could consider any other aspect of the defendant's character or
record and any other circumstances of the offense.  Hence, counsel
was not ineffective for failing to argue this point.

- 110 -

In his state petition for extraordinary relief Correll relied on *Parks v. Brown*, 860 F.2d 1545 (10th Cir. 1988) (*en banc*), and its interpretation of both *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978).  (Respondent's Exhibit XXXVIII at 72)  Parks's jury was instructed that they "must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence."  860 F.2d at 1552.  *Parks*, 860 F.2d at 1548, held "that the anti-sympathy portion of the jury instructions . . . violated the petitioner's eighth amendment rights by creating an impermissible risk of influencing the jury to discount mitigating evidence presented by him."

In the state petition for extraordinary relief Correll recognized that a petition for the writ of *certiorari* was granted to review *Parks*.  The final decision in *Saffle v. Parks*, 494 U.S. 484, 488-89 (1990), rejects Correll's argument:

> [O]ur task is to determine whether a state court considering Parks' claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule Parks seeks was required by the Constitution.
>
> Parks contends that the result he seeks does not involve the creation of a new rule.  Relying upon our decisions in *Lockett v. Ohio,* 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed .2d 1 (1982), both decided before his conviction became final in 1983, and our decision in *California v. Brown,* 479 U.S. 538, 107 S. Ct. 837, 93 L. Ed. 2d 934 (1987), decided after his conviction became final, Parks argues that the Eighth Amendment, as interpreted in 1983, required, and still requires, that jurors be allowed to base the sentencing decision upon the sympathy they feel for the defendant after hearing his mitigating

evidence.  We disagree and conclude that adoption of this principle
would create a new rule as defined in *Teague*[39] and *Penry*.[40]

The final holding in *Parks* is that a "[r]eview of our decisions in *Lockett* and *Eddings*

convinces us that the two cases do not dictate the result urged by Parks."  494 U.S. at

490.  Appellate counsel's alleged error occurred two years before *Parks*'s determination

that a state court would not have felt compelled to rule in Correll's favor.

Consequently, Correll fails to show that appellate counsel rendered ineffective

assistance as alleged in ground VI(3).

## XI.  CONCLUSION

Correll's guilt is indisputable.  The record supports his conviction of four murders

and supports each of the four death sentences.  The trial court properly found that the

evidence proves each aggravating circumstance.[41]  The trial court properly found that

the evidence proves neither a statutory nor a non-statutory mitigating circumstance.

The aggravating circumstances, total twelve; the mitigating circumstances total zero.

Consistent with the teachings of pre-AEDPA authority, such as *Clisby v. Alabama*, 26

---

[39]  *Teague v. Lane*, 489 U.S. 288 (1989).

[40]  *Penry v. Lynaugh*, 492 U.S. 302 (1989).

[41]  The trial court found (1) that "Correll had been previously convicted of another capital
offense" is an aggravating circumstance applicable to each murder, (2) that the "heinous, atrocious,
and cruel" and the "sexual battery" aggravating circumstances apply to the murder of Susan, (3) that
the "heinous, atrocious, and cruel," the "cold, calculated, and premeditated," and the murder "for
the purpose of avoiding or preventing a lawful arrest" aggravating circumstances apply to the murder
of Tuesday, (3) that the murder "during the course of a robbery" and "for the purpose of avoiding or
preventing a lawful arrest" aggravating circumstances apply to the murder of Ms. Jones, and (4) that
the "heinous, atrocious, and cruel" aggravating circumstance applies to the murder of Mrs. Hines.

F.3d 1054, 1057 (11th Cir. 1994), *cert. denied*, 513 U.S. 1162 (1995), the post-conviction

court considered Correll's "new" mitigation "evidence," which the court correctly

determined would not have affected the final sentence

> [T]his court would not have been persuaded to impose a sentence
> of life imprisonment on the basis of any additional information
> contained in the 3.850 motion, nor can it be said that such
> information would have resulted in a life recommendation from
> the jury. Such information in itself is non-persuasive and contrary
> to the evidence that was presented and argued in mitigation.

A careful examination of the record confirms that no constitutional error exists.

Correll's request in the third amended petition (Doc. 119) for the writ of habeas corpus

is **DENIED**. The clerk shall enter a judgment against Correll and close this case.

### DENIAL OF BOTH A
### CERTIFICATE OF APPEALABILITY
### AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Although his third amended petition is reviewed under pre-AEDPA law, *Slack v.

McDaniel*, 529 U.S. 473, 485-86 (2000), instructs that Correll's appeal must proceed

under the AEDPA and its requirement for a certificate of appealability ("COA"):

> [W]hen a habeas corpus petitioner seeks to initiate an appeal of the
> dismissal of a habeas corpus petition after April 24, 1996 (the effective
> date of AEDPA), the right to appeal is governed by the certificate of
> appealability (COA) requirements now found at 28 U.S.C. § 2253(c)
> (1994 ed., Supp. III). This is true whether the habeas corpus petition
> was filed in the district court before or after AEDPA's effective date.

Correll is not entitled to a COA. A prisoner seeking a writ of habeas corpus has

no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C.

§ 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits

issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a COA, Correll must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. at 478; *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Correll cannot meet *Slack*'s prejudice requirement. 529 U.S. at 484. Finally, Correll is not entitled to appeal *in forma pauperis* because he is not entitled to a COA.

Accordingly, a certificate of appealability is **DENIED**. Leave to proceed *in forma pauperis* on appeal is **DENIED**. Correll must pay the full $455 appellate filing fee without installments unless the circuit court allows Correll to proceed *in forma pauperis*.

ORDERED in Tampa, Florida, on March 19, 2013.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE